STEPHEN YAGMAN
NAME
43263-112
PRISON IDENTIFICATION/BOOKING NO.
L.A. MDC   Box 1500
ADDRESS OR PLACE OF CONFINEMENT
L.A.   CA   90053

Note:   If represented by an attorney, provide name, address & telephone
number. *It is your responsibility to notify the Clerk of Court in
writing of any change of address.*

LODGED
CLERK, U.S. DISTRICT COURT
AUG 6 2010
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

STEPHEN YAGMAN,

FULL NAME (Include name under which you were convicted)

Petitioner,

ERWIN MEINBERG, Acting
Warden or his Successor,
NAME OF WARDEN, (or other authorized person having custody of petitioner)

Respondent.

CASE NUMBER:
CV   **CV10  5860 SVW (CW)**
To be supplied by the Clerk of the United States District Court

CR   DOES NOT RELATE TO
Criminal case under which sentence was imposed.
SENTENCE

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN FEDERAL CUSTODY
(28 U.S.C § 2241)**
(CONDITIONS OF CONFINEMENT)
AND EMERGENCY MOTION FOR TRO

### INSTRUCTIONS - READ CAREFULLY

This petition shall be legibly handwritten or typewritten, signed by *the petitioner, under pe*nalty of perjury. You must set forth CONCISELY the answer to each question in the proper space on the form. Any false statement of *a mate*rial fact may serve as the basis for prosecution and conviction for perjury.

You must not attach separate pages to this petition except that ONE separate additional page is permitted in answering Question No.9.

Upon receipt of a fee of $5.00 your petition will be filed if it is in proper order.

If you are seeking leave to proceed *in forma pauperis* (without paying the $5.00 filing fee and other court costs), then you must also execute the declaration on the last page, setting forth information which establishes your inability to pay the fees and costs of the proceedings or to give security therefor. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution. If your prison account exceeds $25.00, you must pay the filing fee as required by the rule of the district court.

When the petition is completed, the original and 3 copies, must be mailed to the Clerk of the United States District Court for the Central District of California, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012, ATTENTION: Intake/Docket Section.

Only one sentence, conviction or parole matter may be challenged in a single petition. If you challenge more than one, you must do so by separate petitions.

TRULINCS 43263112 - YAGMAN, STEPHEN - Unit: LOS-F-S
----------------------------------------------------------------------------------------------------

FROM: 43263112
TO: Yagman, Marion
SUBJECT: TRO
DATE: 8/4/2010 3:12:07 PM

STEPHEN YAGMAN,

Petitioner,

v.

ERWIN MEINBERG, Acting Warden, MDC,
Los Angeles, or his successor,

_____

### EMERGENCY REQUEST FOR TRO

    Based on the Declaration of Stephen Yagman, attached hereto, it is requested that the court issue a TRO restraining
the transfer of the Petitioner outside the Central District of California and outside the Ninth Circuit, in order to preserve and to
defeat any attempt to divest the court of its jurisdiction to hear the instant Section 2241 habeas corpus petition.

                              Respectfully submitted,


                              STEPHEN YAGMAN            05/05/10

---------------------------------------------------------------------------------------

FROM: 43263112
TO: Yagman, Marion
SUBJECT: Declaration
DATE: 8/4/2010 3:06:35 PM

DECLARATION OF STEPHEN YAGMAN IN SUPPORT OF REQUEST FOR TRO

I, STEPHEN YAGMAN, declare the following to be true under the penalty of perjury at Los Angeles, California on August 4, 2010, pursuant to 28 U.S.C. 1746.

1. I am the petitioner in the instant section 2241 habeas corpus, conditions of confinement proceeding.

2. I am told that I shall be transferred from the Los Angeles MDC during the week of August 8, 2010, and if I am transferred either out of the Central District of California or out of the Ninth Circuit, those courts would be divested of jurisdiction of my petition.

3. Therefore, I request that the court temporarily restrain the BOP and Respondent from transferring me both out of the Central District of California and out of the Ninth Circuit so that the jurisdiction of those courts will not be defeated.

4. I have been confined at the Los Angeles MDC since July 2, 2010, and there is no legitimate, much less compelling reason to transfer me to any place outside the Central District of California or the Ninth Circuit, and the only reason to do so would be to defeat jurisdiction of the instant petition.

5. I therefore request issuance of a TRO restraining my transfer.

STEPHEN YAGMAN

1  STEPHEN YAGMAN
2  ~~YAGMAN & YAGMAN & REICHMANN~~
   ~~723 Ocean Front Walk~~  *MDC - LA*
3  ~~Venice Beach, California 90291-3212~~
   ~~(310) 452-3200~~  *Box 1500*
4  ~~Attorneys for Plaintiff~~  *L.A. CA 90053*
5
6
7
8                  **UNITED STATES DISTRICT COURT**
9                  **CENTRAL DISTRICT OF CALIFORNIA**
10                        **WESTERN DIVISION**
11
12  ~~K. CLARK, both individually and as~~   No.
13  ~~representative of the proposed class,~~
    *STEPHEN YAGMAN*
14                  ~~Plaintiffs,~~              **VERIFIED PETITION FOR**
    *Petitioner,*                               **TEMPORARY RESTRAINING**
15               v.                             **ORDER; MEMORANDUM OF**
                                                **POINTS AND AUTHORITIES**
16  ~~TIME WARNER CABLE,~~ a                    ~~(03-19-07)~~
17  ~~corporation, and UNKNOWN~~
    ~~NAMED DEFENDANTS 1-20,~~
18                ~~Defendants.~~
19  *ERWIN MEINBERG,*
20  *Acting Warden, or*
21  *his Successor,*
                    *Respondent.*
22  *Petitioner*
23  ~~Plaintiff~~ applies for a temporary restraining order, and requests that the court
    *Respondent*
24  temporarily order and restrain ~~defendant~~, as follows: ~~(1) Defendant forthwith shall~~
25  ~~cause to be re-connected all of plaintiff's telephone lines and telephone instruments~~
26  ~~with respect to the telephone numbers set forth in the declaration of the plaintiff,~~
    ~~attached hereto; and, (2) Defendant shall not make any oral contact with any~~
27  *From transferring or moving Petitioner out of*
28  *the Central District of California.*

                                    1

1  ~~person or entity for the purpose of proposing to any person or entity transfer their~~

2  ~~telephone service to Defendant Time Warner Cable.~~

3

4  ~~YAGMAN & YAGMAN & REICHMANN~~

5  By: _____  *Stephen Yagman*

6  STEPHEN YAGMAN

7

8  **VERIFICATION** *August 5, 2010*

9  Pursuant to 28 U.S.C. § 1746, on ~~March 16, 2007,~~ I aver that the factual

   *Petition*

10 matter set forth in the ~~complaint~~ filed concurrently herewith and facts set forth in

11 the following memorandum are true on *my* information and belief as set forth in

12 the Declaration ~~of K. Clark,~~ attached hereto, *and filed with the Petition.*

   *my*

13 ~~YAGMAN & YAGMAN & REICHMANN~~

14 By: _____  *Stephen Yagman*

15 STEPHEN YAGMAN

16

17

18

19

20

21

22

23

24

25

26

27

28  //

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

### ~~PLAINTIFF AND CLASS MEMBERS HAVE A RIGHT NOT TO BE "SLAMMED" AND DEPRIVED OF THEIR CHOICE OF TELEPHONE CARRIER.~~

~~Plaintiff has demonstrated, Declaration of K. Clark, attached hereto, that plaintiff was "slammed" with respect to plaintiff's telephone numbers. Defendant, through its representative, "Doug," as set forth in plaintiff's declaration at page four, paragraph 10, admits this.~~

~~Title 47 U.S.C. § 258 and Cal. Pub. Util. Code § 2889.5 both establish the right not to be "slammed." Moreover, plaintiff and class members have the rights not to be subjected to fraud, fraudulent, concealment, and/or negligence on the part of defendant with respect to defendant acquiring telephone numbers held by individuals and not restoring telephone numbers that defendant acquired as the result of fraud, fraudulent concealment, and/or negligence. *See also AT&T Corp. v. FCC*, 323 F.3d 1081 (D.C. Cir. 2003); *Lovejoy v. AT&T Corp.*, 92 Cal.App. 4th 85 (2001); *Lovejoy v. AT&T Corp.*, 119 Cal.App. 4th 151 (2004).~~

### II

### INJUNCTIVE RELIEF BY WAY OF A TRO IS WARRANTED.

As can be seen from the Declaration attached hereto, ~~plaintiff continues to be harmed irreparably.~~ *Petitioner will be it he is moved outside the Central District because the court will be divested of Jurisdiction* ~~Plaintiff is without and is unable to obtain telephone service, service that plaintiff previously had until defendant illegally interfered with that service and caused it to be terminated. Moreover, defendant has failed and refused to correct what it did.~~

~~There is good reason to believe that defendant has been doing this "slamming" and continues to do this "slamming," as is admitted by defendant's~~

3

1   ~~authorized employees and representatives, both "Doug and Mr. Daniel Ibanez, as~~

2   quoted in plaintiff's declaration, at page two, paragraph four thereof, and page six,

3   lines four through eight.

4       Apparently, defendant not only "slams" telephone numbers but also has set

5   up a situation so that it is so difficult and takes so much time, both on the phone

6   and as a period of time, to restore one's telephone number so that persons who

7   have been "slammed" just give up and to with defendant's telephone service.

8   Defendant is acting illegally and playing the odds that no one, if anyone, will sue

9   them, and a significant number of persons simply will give up in dismay and

10  ~~accept defendant as their telephone carrier.~~

11      In the Ninth Circuit, a party may obtain injunctive relief in the form of a

12  temporary restraining order or preliminary injunction by satisfying one of two

13  tests.

14      The traditional test requires "(1) a strong likelihood of success on the merits,

15  (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not

16  granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of

17  the public interest[.]" *Johnson v. California State Board of Accountancy*, 72 F.3d

18  1427, 1430 (9th Cir. 1995). Here, ~~plaintiff~~ petitioner readily satisfies all four criteria, and the

19  public interest would be greatly advanced were this court immediately to put an

20  end to the probability that ~~defendant each day is doing to others what it has done to~~

21  ~~the plaintiff.~~ Respondent will defeat jurisdiction by moving Petitioner outside

22  The Central District.

23      Under the so-called "alternative test," a party seeking injunctive relief must

24  demonstrate either (1) a combination of probable success on the merits and the

25  possibility of irreparable injury; or (2) that serious questions are raised and the

26  balance of hardships tips sharply in the moving party's favor. *Stanley v. Univ. of*

27  *Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994). ~~Plaintiff~~ Petitioner readily has

28  satisfied this test in that ~~"slamming"~~ his discipline is illegal under ~~both~~ federal ~~and state~~ law,

Petitioner
~~plaintiff~~ continues to suffer irreparable injury, and the balance of hardships tips

decidedly in favor of ~~plaintiff~~ Petitioner and against ~~defendant~~ Respondent. Indeed, it seems likely that

unless this court takes action ∧ Petitioner ~~plaintiff~~ will ~~continue to go without telephone~~

~~service.~~ be removed from the Court's jurisdiction.

Taken as a whole, these requirements construct "a sliding scale in which the

required degree of irreparable harm increases as the probability of success

decreases." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir.

1993) (citations and internal quotation marks omitted). Conversely, *mutatis*

*mutandis* and/or by *modus tollens*, as the probability of success increases as the

required degree of irreparable harm decreases. Here, there is both irreparable harm

and decidedly illegal conduct.

Under the test for injunctive relief, a moving party must show that there is a

fair chance of success on the merits. *Stanley,* 13 F.3d at 1319. Likewise, "[u]nder

either formulation of the test, a party seeking an injunction must demonstrate that it

will be exposed to some significant risk of irreparable injury." *Associated General*

*Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.

1991). The ~~defendant~~ Respondent continuing to act as indicated constitutes a continuing and

significant risk of immediate and irreparable injury.

~~Plaintiff~~ Petitioner here has demonstrated that plaintiff, putative class members, and the

general public all are entitled to temporary injunctive relief as follows: (1)

~~Defendant forthwith shall cause to be re-connected all of plaintiff's telephone lines~~

~~and telephone instruments with respect to the telephone numbers set forth in the~~

~~declaration of the plaintiff; and, (2) Defendant shall not make any oral contact with~~

Respondent not move Petitioner outside the Central

District of California.

---

[1] ~~If an emergency arises and plaintiff is not in plaintiff's living room, in her three-~~
~~story residence where the only working telephone is located, and she is unable to~~
~~get to that phone, plaintiff could lose plaintiff's life or suffer very serious, un-~~
~~remedied injury.~~
∨ If Petitioner is moved outside the Central District
of California the Court's jurisdiction will be
defeated.

1   ~~any person or entity for the purpose of proposing to any person or entity transfer~~

2   ~~their telephone service to Defendant Time Warner Cable.~~

3   Petition or ~~Plaintiff~~ has standing to sue and to seek injunctive relief pursuant to 28

4   U.S.C. § 1651, as do all persons subjected to and who are threatened to be

5   subjected to ~~defendant's continued "slamming" practice~~. a potential defeat of federal court jurisdiction

6

7       Standing questions arise as a result of constitutional and prudential

8   limitations on the scope of federal jurisdiction. *Bennett v. Spear*, 520 U.S. 154, 162

9   (1997) (citing *Warth v. Selden,* 422 U.S. 490, 498 [1975]). To satisfy the minimum

10  constitutional requirements for standing under the Case or Controversy

11  requirement of Article III,

12      [f]irst, the plaintiff must have suffered an injury in fact - an invasion of a

13      legally-protected interest which is (a) concrete and particularized and (b)

14      actual or imminent, not conjectural or hypothetical. Second, there must be a

15      causal connection between the injury and the conduct complained of - the

16      injury has to be fairly traceable to the challenged action of the defendant,

17      and not the result of the independent action of some third party not before

18      the court. Third, it must be likely, as opposed to merely speculative, that the

19      injury will be redressed by a favorable decision.

20  *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also, United Food*

21  *and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544,

22  551 (1996). "The necessity that the plaintiff who seeks to invoke judicial power

23  stands to profit in some personal interest remains an Art. III requirement." *Simon v*

24  *Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39 (1976).

25      As to the "injury-in-fact" requirement of the standing test, the Ninth Circuit

26  has held that, to establish standing to seek injunctive relief,

27      [a] plaintiff[] must demonstrate that a "credible threat" exists that they will

28      again be subject to the specific injury for which they seek injunctive or

6

declaratory relief. [] A reasonable showing of a "sufficient likelihood that the plaintiff will be injured again is necessary. [] The "mere physical or theoretical possibility" of a challenged action again affecting the plaintiff is not sufficient. [] There must be a "demonstrated probability" that the plaintiff will again be among those injured . . . .

*Nelsen v. King County*, 895 F.2d 1248, 1250-51 (9th Cir. 1990) (citations and internal quotation marks largely omitted). Here, there is ~~continuing~~ threatened injury.

~~Plaintiff~~ petitioner here has shown ~~plaintiff~~ petitioner has been harmed and continues to suffer harm and that ~~defendant~~ Respondant caused that harm and has failed and refused to remedy it.

Therefore, a temporary restraining order should issue forthwith, pending the issuance of a preliminary injunction, and a hearing for preliminary injunction should be ordered to be had.

~~YAGMAN & YAGMAN & REICHMANN~~

By: *[signature]*

STEPHEN YAGMAN   08/05/10

TRULINCS 43263112 - YAGMAN, STEPHEN - Unit: LOS-F-S

--------------------------------------------------------------------------------

FROM: 43263112
TO: Yagman, Marion
SUBJECT: TRO
DATE: 8/4/2010 3:12:07 PM

STEPHEN YAGMAN,

Petitioner,

v.

ERWIN MEINBERG, Acting Warden, MDC,
Los Angeles, or his successor,

_____

### EMERGENCY REQUEST FOR TRO

　　Based on the Declaration of Stephen Yagman, attached hereto, it is requested that the court issue a TRO restraining the transfer of the Petitioner outside the Central District of California and outside the Ninth Circuit, in order to preserve and to defeat any attempt to divest the court of its jurisdiction to hear the instant Section 2241 habeas corpus petition.

　　　　　　　　　　Respectfully submitted,


　　　　　　　　　　STEPHEN YAGMAN　　　05/05/10

TRULINCS 43263112 - YAGMAN, STEPHEN - Unit: LOS-F-S

Case 2:10-cv-05860-SVW -CW Document 1 Filed 08/06/10 Page 12 of 70 Page ID #:12
--------------------------------------------------------------------------------

FROM: 43263112
TO: Yagman, Marion
SUBJECT: Declaration
DATE: 8/4/2010 3:06:35 PM

DECLARATION OF STEPHEN YAGMAN IN SUPPORT OF REQUEST FOR TRO

I, STEPHEN YAGMAN, declare the following to be true under the penalty of perjury at Los Angeles, California on August 4, 2010, pursuant to 28 U.S.C. 1746.

1. I am the petitioner in the instant section 2241 habeas corpus, conditions of confinement proceeding.

2. I am told that I shall be transferred from the Los Angeles MDC during the week of August 8, 2010, and if I am transferred either out of the Central District of California or out of the Ninth Circuit, those courts would be divested of jurisdiction of my petition.

3. Therefore, I request that the court temporarily restrain the BOP and Respondent from transferring me both out of the Central District of California and out of the Ninth Circuit so that the jurisdiction of those courts will not be defeated.

4. I have been confined at the Los Angeles MDC since July 2, 2010, and there is no legitimate, much less compelling, reason to transfer me to any place outside the Central District of California or the Ninth Circuit, and the only reason to do so would be to defeat jurisdiction of the instant petition.

5. I therefore request issuance of a TRO restraining my transfer.

STEPHEN YAGMAN

STEPHEN YAGMAN
~~YAGMAN & YAGMAN & REICHMANN~~
~~723 Ocean Front Walk~~  *MDC — LA*
~~Venice Beach, California 90291-3212~~
~~(310) 452-3200~~  *Box 1500*
~~Attorneys for Plaintiff~~  *L.A. CA 90053*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

~~K. CLARK, both individually and as~~ ) No.
~~representative of the proposed class,~~ )
*STEPHEN YAGMAN* )
~~Plaintiffs,~~ )        **VERIFIED PETITION FOR**
*Petitioner,* )        **TEMPORARY RESTRAINING**
v. )        **ORDER; MEMORANDUM OF**
)        **POINTS AND AUTHORITIES**
~~TIME WARNER CABLE,~~ a )        ~~(03-19-07)~~
~~corporation, and~~ ~~UNKNOWN~~ )
~~NAMED DEFENDANTS 1-20,~~ )
)
~~Defendants.~~ )
*ERWIN MEINBERG,* )
*Acting Warden, or* )
*his Successor,* )
*Respondent.* )

~~Plaintiff~~ *Petitioner* applies for a temporary restraining order, and requests that the court temporarily order and restrain ~~defendant~~ *Respondent*, as follows: ~~(1) Defendant forthwith shall cause to be re-connected all of plaintiff's telephone lines and telephone instruments with respect to the telephone numbers set forth in the declaration of the plaintiff, attached hereto; and, (2) Defendant shall not make any oral contact with any~~ *From transferring or moving Petitioner out of the Central District of California.*

1

1   ~~person or entity for the purpose of proposing to any person or entity transfer their~~
2   ~~telephone service to Defendant Time Warner Cable.~~

3
4                       ~~YAGMAN & YAGMAN & REICHMANN~~
5                       By: _Stephen Yagman_    _Stephen Yagman_
6                             STEPHEN YAGMAN

7
8                             VERIFICATION  *August 5, 2010*
9       Pursuant to 28 U.S.C. § 1746, on ~~March 16, 2007~~, I aver that the factual
                                                    *Petition*
10   matter set forth in the ~~complaint~~ filed concurrently herewith and facts set forth in
11   the following memorandum are true on my information and belief as set forth in
         *my*
12   the Declaration ~~of K. Clark~~, attached hereto, *and  filed with  the Petition.*

13                       ~~YAGMAN & YAGMAN & REICHMANN~~
14                       By: _Stephen Yagman_    _Stephen Yagman_
                               STEPHEN YAGMAN

15
16
17
18
19
20
21
22
23
24
25
26
27
28   //

## MEMORANDUM OF POINTS AND AUTHORITIES

### I

~~PLAINTIFF AND CLASS MEMBERS HAVE A RIGHT NOT TO BE "SLAMMED" AND DEPRIVED OF THEIR CHOICE OF TELEPHONE CARRIER.~~

~~Plaintiff has demonstrated, Declaration of K. Clark, attached hereto,~~ that plaintiff was "slammed" with respect to plaintiff's telephone numbers. Defendant, through its representative, ~~"Doug," as~~ set forth in plaintiff's declaration at page four, paragraph 10, admits this.

~~Title 47 U.S.C. § 258 and Cal. Pub. Util. Code § 2889.5 both establish~~ the right not to be "slammed." Moreover, plaintiff and class members have the rights not to be subjected to fraud, fraudulent, concealment, and/or negligence on the part of defendant with respect to defendant acquiring telephone numbers held by individuals and not restoring telephone numbers that defendant acquired as the result of fraud, fraudulent concealment, and/or negligence. *See also AT&T Corp. v. FCC*, 323 F.3d 1081 (D.C. Cir. 2003); *Lovejoy v. AT&T Corp.*, 92 Cal.App. 4th 85 (2001); *Lovejoy v. AT&T Corp.*, 119 Cal.App. 4th 151 (2004).

### II

### INJUNCTIVE RELIEF BY WAY OF A TRO IS WARRANTED.

As can be seen from the Declaration attached hereto, ~~plaintiff continues to~~ *Petitioner will be* ~~be harmed irreparably. Plaintiff is without and is unable to obtain telephone~~ *it he is moved outside the Central District* ~~service,~~ *because the court will be divested of Jurisdiction* service that plaintiff previously had until defendant illegally ~~interfered~~ ~~with that service and caused it to be terminated. Moreover, defendant has failed~~ ~~and refused to correct what it did.~~

~~There is good reason to believe that defendant has been doing this~~ ~~"slamming" and continues to do this "slamming," as is admitted by defendant's~~

3

1   authorized employees and representatives, both "Doug and Mr. Daniel Ibanez, as

2   quoted in plaintiff's declaration, at page two, paragraph four thereof, and page six,

3   lines four through eight.

4       Apparently, defendant not only "slams" telephone numbers but also has set

5   up a situation so that it is so difficult and takes so much time, both on the phone

6   and as a period of time, to restore one's telephone number so that persons who

7   have been "slammed" just give up and to with defendant's telephone service.

8   Defendant is acting illegally and playing the odds that no one, if anyone, will sue

9   them, and a significant number of persons simply will give up in dismay and

10  accept defendant as their telephone carrier.

11      In the Ninth Circuit, a party may obtain injunctive relief in the form of a

12  temporary restraining order or preliminary injunction by satisfying one of two

13  tests.

14      The traditional test requires "(1) a strong likelihood of success on the merits,

15  (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not

16  granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of

17  the public interest[.]" *Johnson v. California State Board of Accountancy*, 72 F.3d

18  1427, 1430 (9th Cir. 1995). Here, ~~plaintiff~~ *petitioner* readily satisfies all four criteria, and the

19  public interest would be greatly advanced were this court immediately to put an

20  end to the probability that ~~defendant each day is doing to others what it has done to~~ *Respondent*

21  ~~the plaintiff.~~ *will defeat jurisdiction by moving Petitioner outside*

22  *The Central District.*

23      Under the so-called "alternative test," a party seeking injunctive relief must

24  demonstrate either (1) a combination of probable success on the merits and the

25  possibility of irreparable injury; or (2) that serious questions are raised and the

26  balance of hardships tips sharply in the moving party's favor. *Stanley v. Univ. of*

27  *Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994). ~~Plaintiff~~ *Petitioner* readily has

28  satisfied this test in that "~~slamming~~" *his discipline* is illegal under ~~both~~ federal ~~and state~~ law,

4

*Petitioner*
~~plaintiff~~ continues to suffer irreparable injury, and the balance of hardships tips
decidedly in favor of ~~plaintiff~~ *Petitioner* and against ~~defendant~~ *Respondent*. Indeed, it seems likely that
unless this court takes action ~~plaintiff~~ *Petitioner* will ~~continue to go without telephone~~
~~service~~ *be removed from the court's jurisdiction.*

Taken as a whole, these requirements construct "a sliding scale in which the
required degree of irreparable harm increases as the probability of success
decreases." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir.
1993) (citations and internal quotation marks omitted). Conversely, *mutatis*
*mutandis* and/or by *modus tollens*, as the probability of success increases as the
required degree of irreparable harm decreases. Here, there is both irreparable harm
and decidedly illegal conduct.

Under the test for injunctive relief, a moving party must show that there is a
fair chance of success on the merits. *Stanley,* 13 F.3d at 1319. Likewise, "[u]nder
either formulation of the test, a party seeking an injunction must demonstrate that it
will be exposed to some significant risk of irreparable injury." *Associated General*
*Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir.
1991). The ~~defendant~~ *Respondent* continuing to act as indicated constitutes a continuing and
significant risk of immediate and irreparable injury.

~~Plaintiff~~ *Petitioner* here has demonstrated that plaintiff, putative class members, and the
general public all are entitled to temporary injunctive relief as follows: (1)
~~Defendant forthwith shall cause to be re-connected all of plaintiff's telephone lines~~
~~and telephone instruments with respect to the telephone numbers set forth in the~~
~~declaration of the plaintiff; and, (2) Defendant shall not make any oral contact with~~
*Respondent not move Petitioner outside the Central*
*District of California.*

---

~~[1] If an emergency arises and plaintiff is not in plaintiff's living room, in her three-~~
~~story residence where the only working telephone is located, and she is unable to~~
~~get to that phone, plaintiff could lose plaintiff's life or suffer very serious, un-~~
~~remedied injury.~~
*¥ If Petitioner is moved outside the Central District*
*of California the Court's jurisdiction will be*
*defeated.*

1  ~~any person or entity for the purpose of proposing to any person or entity transfer~~

2  ~~their telephone service to Defendant Time Warner Cable.~~

3  *Petition or*

~~Plaintiff~~ has standing to sue and to seek injunctive relief pursuant to 28

4  U.S.C. § 1651, as do all persons subjected to and who are threatened to be

5  *a potential defeat of federal court jurisdiction*
   subjected to ~~defendant's continued "slamming" practice~~.

6

7     Standing questions arise as a result of constitutional and prudential

8  limitations on the scope of federal jurisdiction. *Bennett v. Spear*, 520 U.S. 154, 162

9  (1997) (citing *Warth v. Selden*, 422 U.S. 490, 498 [1975]). To satisfy the minimum

10 constitutional requirements for standing under the Case or Controversy

11 requirement of Article III,

12        [f]irst, the plaintiff must have suffered an injury in fact - an invasion of a

13        legally-protected interest which is (a) concrete and particularized and (b)

14        actual or imminent, not conjectural or hypothetical. Second, there must be a

15        causal connection between the injury and the conduct complained of - the

16        injury has to be fairly traceable to the challenged action of the defendant,

17        and not the result of the independent action of some third party not before

18        the court. Third, it must be likely, as opposed to merely speculative, that the

19        injury will be redressed by a favorable decision.

20 *Lujan v Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also*, *United Food*

21 *and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544,

22 551 (1996). "The necessity that the plaintiff who seeks to invoke judicial power

23 stands to profit in some personal interest remains an Art. III requirement." *Simon v*

24 *Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 39 (1976).

25     As to the "injury-in-fact" requirement of the standing test, the Ninth Circuit

26 has held that, to establish standing to seek injunctive relief,

27        [a] plaintiff[] must demonstrate that a "credible threat" exists that they will

28        again be subject to the specific injury for which they seek injunctive or

declaratory relief. [] A reasonable showing of a "sufficient likelihood that the plaintiff will be injured again is necessary. [] The "mere physical or theoretical possibility" of a challenged action again affecting the plaintiff is not sufficient. [] There must be a "demonstrated probability" that the plaintiff will again be among those injured . . . .

*Nelsen v. King County*, 895 F.2d 1248, 1250-51 (9th Cir. 1990) (citations and internal quotation marks largely omitted). Here, there is ~~continuing~~ threatened injury.

~~Plaintiff~~ petitioner here has shown ~~plaintiff~~ petitioner has been harmed and continues to suffer harm and that ~~defendant~~ Respondant caused that harm and has failed and refused to remedy it.

Therefore, a temporary restraining order should issue forthwith, pending the issuance of a preliminary injunction, and a hearing for preliminary injunction should be ordered to be had.

~~YAGMAN & YAGMAN & REICHMANN~~

By: _Stephen Yagman_

STEPHEN YAGMAN   08/05/10

7

## DUE PROCESS VIOLATIONS

1. Failure to serve Incident Report on 07/02/10.

2. Refusal to permit witnesses Katherine Turner & John Uyeda.

3. Policy applies only to medications at facility & in possession upon arrival & does not apply to prescription medications not in possession or at home — policy clearly not violated

   - List (Exh 1 - p. 27) given to Uyeda & approval given by him to use all medications, including Donnatol (Bellatal)

4. Unable to cross-examine person(s) who did chemical testing (S. Ct. case)

5. Facility had no medical staff to prescribe medication

6. Policy (Ex. 1 - p. 10) does not prohibit taking Donnatol

7. Took Donnatol in emergency while working at home

## WHAT EXH. 1 SHOWS — 1

PP:

3,8  — notice given on 07/02/10  11:24 A.M.
       by Katherine Turner — false

4,30 — false:(Yagman Decl.); waiver of
       timely service (30) dated 07/28/10

4,5  — there is no medical staff at
       the halfway house to prescribe
       medication

8,9,27 — request to call witnesses denied:
       Turner would have testified she
       didn't serve Incident Report (9)
       on 07/02/10, & that is reason
       S.Y. didn't sign it; Uyeda would
       have testified he was shown
       S.Y. list of medications (27)
       and approved them to be
       taken

10  — policy covers only medications
       in room (TP-1), in possession
       on arrival at halfway house
       (TP-2), and in possession at
       halfway house & not tagged.
                (cont.)

(cont.) —2

10 — Also, the bolded legend—
"REMEMBER DO NOT TAKE ANY
MEDICATION OR MEDICAL ITEMS
TO YOUR ROOM WITHOUT STAFF
APPROVAL"— makes clear that
the MEDICATION POLICY applies only
to medications possessed physically
by a resident "at the time [he]
sign[s] 'into the facility" and
possessed or used in the facility.

11, 12— testing that was accepted without
any ability to challenge

13  — false statement by Turner—see
also 30—waiver—no waiver would
be needed if Turner statement
were true—no chance to
contest Turner or waiver

14  — prescription for Donnatol (Bellatol)
          (cont.)

(cont.) -3

15-24 — authorizations & efforts to
get evidence of prescription
for Donnatol (Bellatol)

25, 28, 29 — evidence showing Donnatol (Bellatal)
contains phenobarbital

26 — shows patient of Dr. Bush
as of 08/02/04, & for
long-time before 08/02/04

27 — list of all medications for S.Y.
as of 03/31/08 - given to federal
prison camp at Butner, N.C.
on arrival on 03/31/08 and
given to John Uyeda upon
check-in to halfway house on
05/13/10. Told by Uyeda
okay to use all, but that
one's had by S.Y. upon
check-in needed to be marked.
Did not have Donnatol in
possession, but it was at home,
where it was taken on 06/22/10.

**U.S. Department of Justice**

**Federal Bureau of Prisons**

_____

*Long Beach Community Corrections Office*
*P.O. Box 323, San Pedro, CA 90733*

Date:       August 2, 2010

To:         YAGMAN, Stephen
            Register No:  43263-112

From:       Wes J. Mayhew  *W. May*
            Community Corrections Manager

Subject:    Incident Report(s) Dated: June 29, 2010
            Offense(s) Code: 112, Use of Drugs
                     #2046414

            Attached is your copy of the Center Discipline Committee Report pertaining
            to the above-referenced incident(s).

            If you disagree with the findings and/or action, you may file an
            administrative remedy appeal within twenty (20) calender days from the date the
            action was imposed to the Regional Director to file your complaint.

            However, if you are to be transferred to a federal institution, it is recommended
            that you wait and use the administrative remedy procedure upon arrival at the
            institution.

            The address of the Regional Director is:

            Regional Director, Western Regional Office
            Federal Bureau of Prisons
            7338 Shoreline Drive
            Stockton, CA 95219


            CC:  CDC Binder
                 Inmate




*REC'D 08/04/10 10 $\frac{15}{a}$ m.  (S.Y.)*

*(1)*

*EXH. 1, pp ① - ㉚*

REGISTER NO: 43263-112 NAME..: YAGMAN, STEPHEN
FUNCTION...: DIS        FORMAT: CHRONO    LIMIT TO ____ MOS PRIOR TO 08-02-2010
                        RSP OF: LOS-LOS ANGELES MDC

--------------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 2046414 - SANCTIONED INCIDENT DATE/TIME: 06-29-2010 0935
CDC HEARING DATE/TIME: 07-28-2010 1306
FACL/LOC/CHAIRPERSON.: CLB/9MG/MCWILLIAMS
REPORT REMARKS.......: POSITIVE DRUG TEST.
   112   USE OF DRUGS/DRUG ITEMS - FREQ: 1
         DIS GCT    / 40 DAYS / CS
         COMP:010 LAW:P   DISALLOWED 40 DAYS GCT.
         TRANSFER   / CS
         COMP:    LAW:    TRANSFER TO A SECURE FACILITY TO BETTER CONTROL.



G0002        MORE PAGES TO FOLLOW . . .



BP-A208.073
MAR 1994

## CENTER DISCIPLINE COMMITTEE REPORT (CCC'S)

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

| Name of Inmate | Register Number | Hearing Date |
|---|---|---|
| Yagman, Stephen | 43263-112 | 07/08/2010 |
| Date of Incident | Date of Incident Report | Prohibited Act(s) Code |
| 06/22/2010 | 06/29/2010 | 112 |

Summary of Charge(s)

Use of any narcotics, marijuana, or related paraphernalia not prescribed for the individual by medical staff.

## I. NOTICE OF CHARGE(S)

Date | Typed Name/Signature DHO

A. Advance written notice of charges (copy of incident report) was given to inmate on

_07/02/2010_ at _11:24 A·m_ by Katherine Turner
Date / Time

B. The CDC Hearing was held on _07/08/2010_ at _9:00 p.m_.
Date / Time

C. The inmate was advised of his rights before this CDC by Kim Fowler-Case Manager

on _07/07/2010_ and a copy of the advisement of rights form is attached.
Date

## II. STAFF REPRESENTATIVE

A. Inmate waived right to staff representative: (Yes/No/NA)
Yes

B. Inmate requested staff representative and N/A _____ appeared.

C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that
N/A

## III. PRESENTATION OF EVIDENCE

A. Inmate has been advised of his right to present a statement or to remain silent, to present documents, including written statements of unavailable witnesses, and for relevant and material witnesses to appear in his behalf at the hearing. Inmate admits/denies the charge(s).
Admits charges

B. Summary of Inmate Statement:

Inmate stated that he unwittingly took a medication (Donnatal) that contains a barbiturate, the medication was taken for intestinal spasms.

C. Witnesses:
1. The inmate requested witnesses: (Yes/No/NA) Yes
2. The following persons were called as witnesses at this hearing and appeared:
N/A

3. A summary of testimony of each is attached: (Yes/No/NA)
4. The following persons requested were not called for the reason(s) given:

John Uyeda is no longer a Cornell employee. Could not jeopardize center safety by calling Monitor Turner to testify, see written attach.
5. Unavailable witnesses were requested to submit written statements and those statements were considered:
(Yes/No/NA) Yes, Ms. Turner.

D. Documentary Evidence: In addition to the Incident Report and Investigation, the Committee considered the following documents:
Toxicology Report, chain of custody, intake form signed by Yagman and Chief of Security Uyeda, medical documents from Yagman.

E. Confidential information was considered by the CDC and not provided to inmate
(Yes/No/NA) N/A



CDC Evidence
Yagman, Stephen
Reg. # 43263-112

## V. Specific Evidence Relied on to Support the Findings.

It should be noted that the Incident Report was not served to you within 24 hrs of the offense as it resulted in a return to custody and you were deemed a flight risk. A waiver for that part of the process is attached. You were served with a copy of the Incident Report when the Marshals service returned to you to close custody on 7/2/10 at 11:24 a.m. This did not prevent you from presenting a defense. It is also noted that on section 4 of the Incident Report the date was entered incorrectly as was the time on section 5. The date of the incident was 6/22/10 at 8:10 p.m. when you submitted the positive UA sample. This did not change the fact that specimen #733081 that you submitted to the security staff member tested positive for Barbiturates and Phenobarbital.

The CDC finds you guilty of violating Code 112; Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by medical staff. The CDC considered the written account of the reporting staff member. "At 9:35 a.m. on 6/29/10, Job developer, Jeannifer Del Campo was pulling the Specimen disposition sheets from the Redwood Toxicology Laboratory website. The lab results indicated a positive test result for (Barbiturates confirmed Phenobarbital) for specimen # 733081. A Review of the Chain of Custody record for Specimen #733081 indicated that inmate Yagman, Stephen Reg. #43263-112 submitted the UA specimen on 6/22/10 at 8:10 p.m. to Monitor Staff John Rutherford. A review of the medication log indicates inmate Yagman was not approved for any medication that would produce a positive for the substances. Based on the above information, Yagman, Stephen Reg. # 43263-112 is being cited for violation of code # 112, Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff.

The CDC considered your statement, "John Uyeda never advised me I could not take prescription medication or gave me written rules that said that, and I took a Donnatal on either 6/21/10 or 6/22/10 for intestinal pain." The CDC also considered the documentation submitted by you, a prescription for Donnatal dated 4/10/06 from Geller, Rudnik, Bush & Bamberger, M.D.'s.

The CDC gave less weight to your statement, "John Uyeda never advised me I could not take prescription medication or gave me written rules that said that, and I took a Donnatal on either 6/21/10 or 6/22/10 for intestinal pain." The CDC also gave less weight to your documentation submitted by you, a prescription for Donnatal dated 4/10/06 from Geller, Rudnik, Bush & Bamberger, M.D.'s.

→ there is no medical staff

(4)

The CDC gave more weight to the reporting staff member's statement that you tested positive for barbiturates/Phenobarbital, the positive Redwood Toxicology Laboratory report on Specimen #733081, the Marvin Gardens Medication policy signed by John Uyeda and Stephen Yagman on 5/13/10 during intake screening and finally your own admission that you took a "Donnatal" on or about 6/21/10 or 6/22/10. The CDC also gave more weight to the fact that you never submitted any prescription medication to staff for review and or approval prior to use

Therefore based on the information stated above, you are found guilty of violating Code 112; Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by medical staff.

5

BP-E208 (Continued)

## IV. FINDINGS OF THE COMMITTEE

☑ a. The act was committed as charged.

☐ b. The following act was committed: _____

☐ c. No prohibited act was committed: Expunge according to your Statement of Work.

## V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS

See attached.

## VI. SANCTION RECOMMENDATION

1) Return to close custody.
2) Loss of 75% Good conduct time.

## VII. REASON FOR SANCTION RECOMMENDATION

Hopefully by returning Yagman to a more secure setting and pulling good time this will discourage this type of behavior in the future.

## VIII. APPEAL RIGHTS

The inmate has been advised of the findings, specific evidence relied on, action and reasons for the action. The inmate has been advised of his right to appeal under the Administrative Remedy Procedure or by letter within 20 days of the imposition of the sanction to the Regional Director. A copy of this report has been given to the inmate.

## IX. DISCIPLINE COMMITTEE

| Chairperson | Member | Member |
|---|---|---|
| *Jerry Kunce* | | |

## X. ACTION BY DHO

| Typed Name/Signature - DHO | Date |
|---|---|
| | |

END FORM



**INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RRC'S)**
MAR 94
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

## Marvin Gardens
### Facility

As an inmate charged with a violation of Center rules or regulations referred to the Discipline
Committee for disposition, you have the following rights:

1. The right to have a written copy of the charge(s) against you at least 24 hours prior to
   appearing before the Center Discipline Committee;

2. The right to have a member of the staff who is reasonably available represent you before the
   Center Discipline Committee;

3. The right to call witnesses and present documentary evidence in your behalf, provided Center
   safety would not be jeopardized;

4. The right to remain silent. Your silence may be used to draw an adverse inference against
   you. However, your silence alone may not be used to support a finding that you committed
   a prohibited act;

5. The right to be present throughout the Center Discipline Committee hearing except during
   Committee deliberations and except where Center safety would be jeopardized;

6. The right to be advised of the Center Discipline Committee recommendation and Bureau of
   Prisons' decision, the facts supporting the recommendation and decision, except where Center
   safety would be jeopardized, and the disposition in writing; and,

7. The right to contest under Administrative Remedy procedures or by letter the Bureau of
   Prisons' decision to the Regional Director within 20 days of notice of the decision and
   disposition.

I hereby acknowledge that I have been advised of the above rights afforded me at a Center Discipline
Committee hearing.

Signed: _____ Reg. No.: _____ Date: _____

Notice of rights given to Inmate on __7/7/10__ by _____
                                        Date                Employee Signature

---

**INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING (RRC's)**

## Marvin Garden
### Facility

When an inmate has been advised of the rights afforded at a Center Discipline hearing, but refuses
to sign the acknowledgment, the following should be completed.

I have personally advised __Yagman, Stephen 43263-112__ of the above rights afforded
                            Inmate's name and Register No.
at a Center Discipline Committee hearing, however, the inmate refused to sign the acknowledgment.

                                Signed: _____

                                        __Kim Fowler__
                                        (Employee's Typed Name)

                                        __7/7/10__
                                        (Date)


7

BP-A207.073
MAR 1994

**NOTICE OF CENTER DISCIPLINE COMMITTEE HEARING (CCC'S)**

**U.S. DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF PRISONS**

Date **7/7/10**

Facility
Cornell-Marvin Gardens Facility 9411 S. Central Ave. Los Angeles, CA 91002

Inmate **Yagman, Stephen**          Register Number **43263-112**

Alleged Violation(s) **use of any narcotics, marijuana, drugs, or related paraphernalia not perscribed for the individual by the medical staff.**

Date of Offense **6/29/10**          Code Number **112**

You are being referred to the Center Discipline Committee for the above charge(s).

The hearing will be held on: **7/7/10**          at **4 pm**

at the following location: **Metropolitan Detention Center**

(Sy) **as a witness**
You are entitled to have a staff member represent you at the hearing. Please indicate below whether you desire to have a staff representative, and if so, his or her name. **X    John Uyeda, as a witness    witness**

Inmate's Initials **(Sy)**      ☐ I (do) wish to have a staff representative. **witness**

Inmate's Initials _____      ☐ I (do not) wish to have a staff representative.

(Sy) If so, the staff ~~representative's~~ **witness** name is: **John Uyeda as a witness, not as a representative**

You will also have the right to call witnesses at the hearing and to present documentary evidence in your behalf, provided calling your witnesses will not jeopardize Center safety. Names of witnesses you wish to call should be listed below.

Inmate's Initials _____   Briefly state what each proposed witness would be able to testify to.
**also   Katheryne Turnov - didn't serve incident report**
Name: **John Uyeda**          , Can Testify to: **never advised me**

**I could not take prescription medication, or gave me written rules**
Name: **that said that .**          , Can Testify to: _____

**- Evidence - prescription for medication - Shows legally prescribed**
Name: **PDR page**          , Can Testify to: **- shows contents**

**I was not served with the incident report until 07/07/10 at 11:45 a.m. and specifically was not served on "7-2-10" at 11:24 a.m." as indicated on it**

The Chairman of the Center Discipline Committee will call those witnesses (Staff or Inmate) who are reasonably available, and who are determined by him/her to be necessary for an appreciation of the circumstances surrounding the charge(s). Repetitive witnesses need not be called. Unavailable witnesses may be asked to submit written statements.

Date, sign, and return this form to the Chairman of the Center Discipline Committee.

Date _____   Inmate Signature/Reg. No. **Stephen Yagman**

Notice of hearing given to inmate by (Employee Signature) _____   Date **7/7/10**

(8)

Original copy

BP-S205.073   **INCIDENT REPORT (CCC'S)   CDFRM**
MAR 94
**U.S. DEPARTMENT OF JUSTICE**

**FEDERAL BUREAU OF PRISONS**

## Part I - Incident

| 1. Name of Center |
|---|
| Cornell Pre-Release Marvin Gardens RRC |

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time of Incident |
|---|---|---|---|
| Yagman, Stephen | 43263-112 | 6/29/10 | 9:35 a.m. |

| 6. Place of Incident | 7. Assignment | 8. Quarters |
|---|---|---|
| Facility | Pre-Release | Rm. 6 4B |

| 9. Incident | 10. Code |
|---|---|
| Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff  *none* | # 112 |

11.  Description of Incident (DATE  6/29/10  and TIME  9:55am staff became aware of incident)

At 9:35 a.m. on 6/29/10, Job developer, Jeannifer Del Campo was pulling the Specimen disposition sheets from the Redwood Toxicology Laboratory website. The lab results indicated a positive test result for (Barbiturates confirmed Phenobarbital) for specimen # 733081. A Review of the Chain of Custody record for Specimen #733081 indicated that inmate Yagman, Stephen Reg. #43263-112 submitted the UA specimen on 6/22/10 at 8:10 p.m. to Monitor Staff John Rutherford.

A review of the medication log indicates inmate Yagman was not approved for any medication that would produce a positive for the substances.

Based on the above information, Yagman, Stephen Reg. # 43263-112 is being cited for violation of code # 112, Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff.  *none*

| 12. Signature of Reporting Employee | 13. Name and Title (Printed) | a. Date and Time |
|---|---|---|
|  | J. Del Campo Job Developer | 6/29/10   2:26 p.m. |

| 14. Incident Report Delivered to Inmate by | 15. Date Delivered | 16. Time Delivered |
|---|---|---|
| Katheline Quinn | 7-2-10 | 11:24 A.m |

(Continued Below) (incdnt1)

I have received a copy of this form: _____

Resident's Signature



# MEDICATION POLICY

1.      No medication prescription or non-prescription; over-the-counter inhalers, protein powder, vitamins, throat lozenges, aspirin, eye drops, foot powder, medicated creams; or any other medications may be taken to your room without staff approval.

2.      All medications prescription or non-prescription must be turned into staff at the time you sign into the facility.

3.      Medications approved for a resident to keep in personal possession will be tagged and returned to resident. Any medication labeled as "HOT" will be maintained in the Control Center locked in the medicine cabinet.

4.      Any medical items which staff has not tagged as approved items will be considered contraband and confiscated upon discovery. Disciplinary action may follow.

*in the facility*

**REMEMBER DO NOT TAKE ANY MEDICATION OR MEDICAL ITEMS TO YOUR ROOM WITHOUT STAFF APPROVAL.**

# HARASSMENT REPORTING PROCEDURES

In the event you ever feel physically and/or sexually threatened by a resident or staff member, contact the Facility Director immediately. If the Facility Director is not available, inform available staff that it is an emergency and you need to speak with the Facility Director.

RESIDENT SIGNATURE _____ DATE 5/13/10

STAFF SIGNATURE _____ DATE 5/13/10



**TOXICOLOGY LABORATORY**
3650 Westwind Blvd . Santa Rosa, CA 95403

## Federal Bureau of Prisons / *chain of custody for drug analysis*

| RESULTS NAME AND ADDRESS: | SPECIMEN NUMBER: **733081** |
|---|---|

Marvin Gardens Center (10C) · Client
9411 South Central Avenue
Los Angeles, CA 90002

**ACCOUNT NUMBER** 60072

**SPECIAL TESTS REQUESTED:**
[ ] H7O Basic + PCP, THC, Meth & Creat     [ ] 667 ETG

**INSTITUTION CODE:** 9 m 6

**INSTITUTION SECURITY LEVEL** (check one):
☐ 01—Minimum   ☐ 02—Low   ☐ 03—Medium
☐ 04—High   ☐ 05—Administrative   ☐ 06—Community

1. To the extent possible, urine samples should be collected in one or two centralized areas of the institution, e.g. Lieutenant's office or R & D, by staff who are thoroughly familiar with the procedures specified below.

2. Inmates shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and will thoroughly wash their hands prior to providing the sample. Prior to collecting the sample, a staff member shall complete all blocks of the Chain of Custody form **except** for Time Provided and Collector and Inmate Certification.

3. When the inmate reports for testing, staff shall make a positive picture identification of the inmate; shall collect a specimen from the inmate under direct observation; shall complete time provided information; shall ensure that the specimen bottle is tightly capped; and shall affix a label containing the specimen number to the Urine Surveillance Log. Ordinarily, to be submitted for testing, bottles should be full.

4. The inmate shall verify that the specimen numbers (i.e. barcode numbers) on the Chain of Custody form, on the peel-off barcode, and on the numbered label to be affixed to the Urine Surveillance Log are identical.

5. After verification, the collector shall affix the barcode and security seals to the specimen bottle. The inmate shall be asked to initial the security seal and to read and sign the Inmate Certification Statement.

6. The staff member collecting the specimen shall read and sign the Collector Certification Statement. If the inmate refuses to sign the Inmate Certification or initial the security seal, a second staff member shall also sign the Collector Certification and shall initial the security seal.

7. After samples are collected, they shall be maintained under direct staff observation until moved to a locked area where they may be stored until mailing. This area shall be designated by the Urine Surveillance Program Coordinator and should be one which is accessible to a very limited number of staff and to no inmates.

8. All samples shall be sent to Redwood Toxicology Laboratory no later than the first work day after they are collected.

9. When a positive result is received, an incident report shall be written unless medical staff indicates a positive result is due to authorized medication. A photocopy of both the laboratory report and the Chain of Custody form (retained at the institution) containing the inmate's name, registration number and specimen number shall be attached to the incident report and made part of the disciplinary record.

**TEST REASON:**
☐ 01—Random   ☐ 02—Suspect   ☐ 03—Community   ☐ 04—Disruptive Group   ☐ 05—Saturation Group Testing   ☐ 06—Prior Use

**INMATE NAME:** (Last, First, I.)  Yagman   Stephen

**REGISTER #:** 43263-112

**DATE COLLECTED:** 6-22-10   **TIME REQUESTED:** 810 AM/PM   **TIME PROVIDED:** 8:10 AM/PM

**COLLECTOR CERTIFICATION:** I certify that the specimen identified on this form is the specimen presented to me by the inmate providing the certification below, that it bears the same identification number as set forth above, and that it has been collected, labeled and sealed in accordance with the collection procedures provided above.

John Rutherford

Staff Member Collecting Specimen (Last, First, I.)          Staff Member's (Collector) Signature

**INMATE CERTIFICATION:** I certify that the specimen accompanying this form is my own and that I provided it to the collector. Further, I certify that the specimen was sealed in my presence and that the information on this form and label is correct

Stephen Yagman

Second Witness Signature (To be completed by second staff member if inmate declines to sign.)          Inmate's (Donor's) Signature



Apply ▶
Barcode
vertically
on bottle.



**REDWOOD
TOXICOLOGY
LABORATORY**

3650 Westwind Blvd., Santa Rosa, CA 95403
Phone: 707-577-7959 // 800-255-2159
Fax: 707-577-0365
www.redwoodtoxicology.com

Marvin Gardens Center (105) - Client
9411 South Central Avenue
Los Angeles, CA 90002

| ACCOUNT NUMBER | ACCESSION NUMBER |
|---|---|
| 60072 | 100624-13465 |
| IDENTIFICATION | |
| 733081 Req# 733081 | |
| ORDERED BY | |
| Marvin Gardens Center (105) - Client | |
| NOTES | |
| | |
| COLLECTED | |
| 6/22/2010 | |
| RECEIVED | REPORTED |
| 6/24/2010 | 6/28/2010 |

| POSITIVES | TEST | RESULT |
|---|---|---|
| | Creatinine | 151.6 mg/dL |
| | Opiates | None Detected |
| | Benzodiazepines | None Detected |
| POS ---------> | Barbiturates | Positive |
| POS ---------> | 500 ng/mL Cutoff Confirmed as Phenobarbital by GC/MS | Positive |
| | Methadone | None Detected |
| | Phencyclidine (PCP) | None Detected |
| | Cocaine (Benzoylecgonine) | None Detected |
| | THC (Marijuana) EIA cutoff level is 20 ng/ml. | None Detected |
| | Amphetamines | None Detected |

NOTE: Phenobarbital = 581 ng/mL.

The results for this specimen have been tested in accordance with all Redwood Toxicology Laboratory standard operating procedures and have been reviewed by laboratory certifying scientists.

Chief Toxicologist: Wayne Ross, M.C.L.S.

100624-13465     6/29/2010 8:18:54 AM

**Laboratory Directors:**
Mark J. DeMeo, M.D.
Richard R. Wilber, M.D.

Specimen disposition: Specimens will be disposed as follows: Negatives: destroyed within 2 days; Positives: destroyed after 6 months; all methadone maintenance unnes after 2 months.





**CORNELL**

Cornell Companies, Inc.

## MEMORANDUM

Date: 07/09/10

To whom this may concern,

I, Katherine Turner, served resident Yagman, Stephen Reg. # 43263-112 an incident report on 07/02/10 at 11:24a.m regarding violation of code # 112 which was issued to him by Jeannifer Del Campo on 06/29/10. This incident report was served to Mr. Yagman while he was detained by the US Marshals.

If you have any questions or concerns regarding this matter, feel free to contact my supervisor Mike Reed or myself.


Katherine Turner

Cornell Companies Marvin Garden Center, 9411 South Central Avenue
Los Angeles, CA 90002
323-563-1126 • Fax 323-563-8890





## YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to: Kevin Kency | From: Marion R. Yagman |
|---|---|
| Attention | Date: July 9, 2010 |
| Office location: | Office location: |
| Fax number: 323-563-2164 | Phone number: (310) 397-4714<br>Fax: 310-397-0611 |

Re: Stephen Yagman,

Dear Mr. Kency: Attached please find a copy of a prescription for Donnatal Extentabs prescribed by Dr. Michael Bush for Stephen Yagman, which I obtained as part of Mr. Yagman's medical records. Marion R. Yagman

## CONFIDENTIALITY NOTICE

This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed. This communication contains information that may be privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution, or other use of this communication is strictly prohibited. If you have received this communication by mistake, please notify the sender immediately by fax or by telephone and destroy all forms of this communication.



**YAGMAN & YAGMAN & REICHMANN**
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to: Walgreen's Pharmacy. | From: Marion R. Yagman |
|---|---|
| Attention: James | Date: July 7, 2010 |
| Office location: | Office location: |
| Fax number: (310) 823-7175 | Phone number: (310) 397-4714<br>Fax: 310-397-0611 |

Re: Stephen Yagman, dob: 12/19/1944;
    Home address: 723 Ocean Front Walk Venice, CA 90291

Dear James: Attached is Stephen Yagman's handwritten authorization for the release of his prescriptions. Mr. Yagman filled his prescriptions at Walgreen prior to May 2008. Because the authorization is not written on your standard form, the record of Mr. Yagman's prescriptions can be sent to his home address listed with you. Mr. Yagman needs to have his prescription records immediately, and it would be appreciated if Mr. Yagman could receive copies of his prescriptions filled at Walgreen at your earliest convenience. Thank you. Marion R. Yagman

---

**CONFIDENTIALITY NOTICE**

This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed. This communication contains information that may be privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution, or other use of this communication is strictly prohibited. If you have received this communication by mistake, please notify the sender immediately by fax or by telephone and destroy all forms of this communication.



AUTHORIZATION FOR
RELEASE OF MEDICAL PRESCRIPTIONS

I, STEPHEN YAGMAN, hereby authorize the release of any and all medical prescriptions filled by Walgreens during the period 2000 to the present date to my attorney in fact, Marion R. Yagman, of Yagman & Yagman & Reichmann. Copies of this Authorization shall be as valid as originals.

Stephen Yagman  07/04/10
STEPHEN YAGMAN

(17)

TRANSMISSION VERIFICATION REPORT

```
                                    TIME   : 07/07/2010 09:23
                                    NAME   :
                                    FAX    :
                                    TEL    :
                                    SER. # : BROK3J753289
```

```
        DATE,TIME              07/07  09:22
        FAX NO./NAME           13108237175
        DURATION               00:00:56
        PAGE(S)                02
        RESULT                 OK
        MODE                   STANDARD
```

## YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to: Walgreen's Pharmacy. | From: Marion R. Yagman |
|---|---|
| Attention: James | Date: July 7, 2010 |
| Office location: | Office location: |
| Fax number: (310) 823-7175 | Phone number: (310) 397-4714<br>Fax: 310-397-0511 |

Re: Stephen Yagman, dob: 12/19/1944;
    Home address: 723 Ocean Front Walk Venice, CA 90291

Dear James: Attached is Stephen Yagman's handwritten authorization for the release of his prescriptions. Mr. Yagman filled his prescriptions at Walgreen prior to May 2008. Because the authorization is not written on your standard form, the record of Mr. Yagman's prescriptions can be sent to his home address listed with you. Mr. Yagman needs to have his prescription records immediately, and it would be appreciated if Mr. Yagman could receive copies of his prescriptions filled at Walgreen at your earliest convenience. Thank you.
Marion R. Yagman

---

**CONFIDENTIALITY NOTICE**



**YAGMAN & YAGMAN & REICHMANN**
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| | |
|---|---|
| Send to:  Dr. Bush | From:  Marion R. Yagman |
| Attention  Maryann | Date:  July 7, 2010 |
| Office location: | Office location: |
| Fax number:  (310) 652-4317 | Phone number: (310) 397-4714<br>Fax:  310-397-0611 |

Re: Stephen Yagman, dob: 12/19/1944;

Attached is Stephen Yagman's handwritten authorization for the release of his medical records. Dr. Paul Geller was Mr. Yagman's primary physician, but he also saw Dr. Bush on several occasions. We only need Stephen Yagman's medical records from 2004 onwards, and if they are not in storage, I would appreciate it if you could fax them to the above fax number today. Thanks. Marion R. Yagman

---

### CONFIDENTIALITY NOTICE

This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed.  This communication contains information that may be privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution, or other use of this communication is strictly prohibited.  If you have received this communication by mistake, please notify the sender immediately by fax or by telephone and destroy all forms of this communication.

19

## MEDICAL AUTHORIZATION

To whom this may concern:

I, STEPHEN YAGMAN, hereby authorize Marion R. Yagman, my attorney in fact, to have full access to and to obtain or make copies of, any and all of my medical records and prescriptions. Copies shall be as valid as originals, of this original authorization

*Stephen Yagman*

STEPHEN YAGMAN 07/04/10

20

```
┌─────────────────────────────────────┐
│  TRANSMISSION VERIFICATION REPORT    │
└─────────────────────────────────────┘

                        TIME  : 07/07/2010 09:57
                        NAME  :
                        FAX   :
                        TEL   :
                        SER.# : BROK3J753289
```

```
DATE,TIME          07/07  09:56
FAX NO./NAME       13106524317
DURATION           00:00:30
PAGE(S)            02
RESULT             OK
MODE               STANDARD
                   ECM
```

# YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to: Dr. Bush | From: Marion R. Yagman |
|---|---|
| Attention  Maryann | Date: July 7, 2010 |
| Office location: | Office location: |
| Fax number: (310) 652-4317 | Phone number: (310) 397-4714<br>Fax: 310-397-0611 |

Re: Stephen Yagman, dob:  12/19/1944;

Attached is Stephen Yagman's handwritten authorization for the release of his medical records. Dr. Paul Galler was Mr. Yagman's primary physician, but he also saw Dr. Bush on several occasions. We only need Stephen Yagman's medical records from 2004 onwards, and if they are not in storage, I would appreciate it if you could fax them to the above fax number today. Thanks.  Marion R. Yagman

---

### CONFIDENTIALITY NOTICE

This communication and any files or documents attached to it are intended only for the use



**YAGMAN & YAGMAN & REICHMANN**
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to:  CVS Pharmacy. | From:  Marion R. Yagman |
|---|---|
| Attention: Elisabeth | Date:  July 7, 2010 |
| Office location: | Office location: |
| Fax number: (401) 216-3362 | Phone number: (310) 397-4714<br>Fax:  310-397-0611 |

Re: Stephen Yagman, dob:  12/19/1944;
     Home address:  723 Ocean Front Walk Venice, CA 90291

Dear Elizabeth:  Further to our telephone conversation today, enclosed please find  Stephen Yagman's authorization to receive copies of his prescriptions, which you advised me you will mail to his home address, which is listed above.  Thank you.  Marion R. Yagman

---

**CONFIDENTIALITY NOTICE**

This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed.  This communication contains information that may be privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution, or other use of this communication is strictly prohibited. If you have received this communication by mistake, please notify the sender immediately by fax or by telephone and destroy all forms of this communication.



AUTHORIZATION FOR
RELEASE OF MEDICAL PRESCRIPTIONS

I, STEPHEN YAGMAN, hereby authorize the release of any and all medical prescriptions (Sy) filled by CVS pharmacy, or any of its predecessors, such as Savon, during the period 2000 to the present date to my attorney in fact, Marion R. Yagman, of Yagman & Yagman & Reichmann. Copies of this Authorization shall be as valid as (Sy) originals.

STEPHEN YAGMAN  07/04/10

23

TRANSMISSION VERIFICATION REPORT

```
                                      TIME  : 07/07/2010 00:00
                                      NAME  :
                                      FAX   :
                                      TEL   :
                                      SER.# : BROK3J753289
```

```
DATE,TIME              07/07  07:59
FAX NO./NAME           14012163362
DURATION               00:00:29
PAGE(S)                02
RESULT                 OK
MODE                   STANDARD
                       ECM
```

## YAGMAN & YAGMAN & REICHMANN
### 723 Ocean Front Walk
### Venice, CA 90291
### (310) 452-3200

| Send to: CVS Pharmacy. | From: Marion R. Yagman |
|---|---|
| Attention: Elisabeth | Date: July 7, 2010 |
| Office location: | Office location: |
| Fax number: (401) 216-3352 | Phone number: (310) 397-4714<br>Fax: 310-397-0611 |

Re: Stephen Yagman, dob: 12/19/1944;
    Home address: 723 Ocean Front Walk Venice, CA 90291

Dear Elizabeth:  Further to our telephone conversation today, enclosed please find  Stephen Yagman's
authorization to receive copies of his prescriptions, which you advised me you will mail to his home address,
which is listed above.  Thank you.  Marion R. Yagman

---

### CONFIDENTIALITY NOTICE

This communication and any files or documents attached to it are intended only for the use



FROM WEB MD

## BELLATAL ER Oral

Important Note: The following information is intended to supplement, not substitute for, the expertise and judgment of your physician, pharmacist or other healthcare professional. It should not be construed to indicate that use of the drug is safe, appropriate, or effective for you. Consult your healthcare professional before using this drug.

## BELLADONNA ALKALOIDS / PHENOBARBITAL - ORAL

**PRONUNCIATION:** (bell-a-DON-a al-KA-loyd/fee-noe-BAR-bi-tal)
<u>Review this Drug3 User Reviews</u>

**·USES**



- **Who should not take BELLATAL ER Oral?**

**BELLATAL ER ORAL USES**

This product contains several medications: belladonna alkaloids (made up of the drugs hyoscyamine, atropine, and scopolamine) and phenobarbital. Belladonna alkaloids help to reduce the symptoms of stomach and intestinal cramping. They work by slowing the natural movements of the gut and by relaxing the muscles in the stomach and intestines. Belladonna alkaloids belong to a class of drugs known as anticholinergics/antispasmodics. Phenobarbital helps to reduce anxiety. It acts on the brain to produce a calming effect. Phenobarbital belongs to a class of drugs known as barbiturate sedatives.

OTHER USES: This section contains uses of this drug that are not listed in the approved professional labeling for the drug but that may be prescribed by your health care professional. Use this drug for a condition that is listed in this section only if it has been so prescribed by your health care professional. This drug may also be used to relieve the symptoms of irritable bowel syndrome.

**How to use BELLATAL ER Oral**

Take this medication by mouth as directed by your doctor. If you are taking the immediate-release tablets or liquid form of this medication, take it usually 3 to 4 times a day or as directed by your doctor.

If you are using the liquid, carefully measure the dose using a special measuring device/spoon. Do not use a household spoon because you may not get the correct dose.

If you are taking the extended-release tablets, take them usually every 12 hours or as directed by your doctor. Swallow the extended-release tablets whole. Do not crush, chew, or break the tablets. Doing so can release all of the drug at once, increasing the risk of side effects.

Antacids lower the absorption of this medication. If you are taking an antacid, take it at least 2 hours apart from this medication.

The dosage is based on your medical condition and response to treatment. In children, the dosage is also based on weight.

Do not increase your dose or take this drug more often without your doctor's approval. Your condition will not improve any faster and the risk of serious side effects may increase.

This medication may cause withdrawal reactions, especially if it has been used regularly for a long time or in high doses. In such cases, withdrawal symptoms (such as anxiety, muscle twitching, shakiness, dizziness, worsening weakness, nausea, vomiting) may occur if you suddenly stop using this medication. Withdrawal from the phenobarbital can be severe and include seizures and (rarely) death. To prevent withdrawal reactions, your doctor may reduce your dose gradually. Consult your doctor or pharmacist for more details, and report any withdrawal reactions immediately.

When this medication is used for a long time, it may not work as well. Your doctor may need to increase your dose or change your medication. Talk with your doctor if this medication stops working well.

Along with its benefits, this medication may rarely cause abnormal drug-seeking behavior (addiction). This risk may be increased if you have abused alcohol or drugs in the past. Take this medication exactly as prescribed to lessen the risk of addiction.

Tell your doctor if your condition persists or worsens.



# REGISTRATION   GELLER, RUDNICK, BUSH & BAMBERGER
## A MEDICAL CORPORATION

PLEASE PRINT

Date: 08/02/04                                      Home Phone _____   Cell: _____

Patient Name ___ YAGMAN ___   STEPHEN ___
              Last Name          First Name          Middle Initial

Responsible Party if minor _____

Street Address ___ 723 Ocean Front Walk ___

City ___ Venice Beach ___   State CA ___   Zip 90291-3220

E-Mail _____   Driver's License # _____

BILLING ADDRESS IF DIFFERENT _____

---

Sex __X__ M __ F  Age ___  Birthdate 12/19/44     Single  Married  Widowed  Seperated  Divorced

Patient Employed by ___ Yagman & Yagman & Reichmann ___

Business Address ___ Same as above ___

Occupation ___ lawyer ___   Business Phone (310) 452-3200

Spouse Name (or responsible party) _____   Birthdate _____

Business Name & Address _____

Occupation _____   Business Phone _____

Who is responsible for this account? Stephen Yagman   Relationship to patient Self

Social Security # 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   Spouse Social Security # _____

In case of emergency who should we notify? _____   Phone _____

Relationship _____   Address _____

Who referred you to our practice? long-time patient

Do you have medical insurance? __ No __X Yes  If Yes, complete insurance info below.

Name/address of Primary Insurer ___ Blue Cross ___ (800) 333-0912

Group # ___ PPO ___   Subscriber # XDL 673A 61563

Name/address of Secondary Insurer (if any) ___ Claims: Box 60007, LA CA 90060 ___

Group # _____   Subscriber # _____

---

**ASSIGNMENT AND RELEASE**

I, the undersigned, have insurance coverage with, _Blue Cross_ and assign directly to Drs. Geller, Rudnick, Bush and Bamberger all medical benefits, if any, otherwise payable to me for services rendered. I understand that I am financially responsible for all charges whether or not paid by insurance. I hereby authorize the doctor to release all information necessary to secure payment of benefits. I authorize the use of this signature on all my medical insurance submissions.

_____Stephen Yagman_____          08/02/04
Signature of Insured/Guardian          Date

**MEDICARE AUTHORIZATION**

I request that payment of authorized Medicare benefits be made either to me or on my behalf to Drs. Geller, Rudnick, Bush and Bamberger for any services furnished me by these physicians. I authorize any holder of medical information about me to release to the Health Care Financing Administration and its agents any information needed to determine these benefits or the benefits payable for related services. I understand my signature requests that payment be made and authorizes release of medical information necessary to pay the claim. If "other health insurance" is indicated in item 9 of HCFA 1500 form, or elsewhere on other approved claim forms or electronically submitted claims, my signature authorizes releasing information to the insurer or agency shown.

_____          _____
Beneficiary Signature          Date

26

## MEDICATIONS-STEPHEN YAGMAN 03-31-08

*Avapro, 300 mg., (heart) every morning before eating
*Lipitor, 80 mg., (heart, high blood pressure) every morning before eating
*Hydrochlorothiazide, 25 mg. (heart, diuretic) every morning before eating
*Levothyroxine, 0.150 mg. (low thyroid disease) every morning before eating
*Metoprolol Succ ER, 100 mg. every evening before going to sleep
Nexium, 40 mg. (stomach/duodenal ulcers and antral spots), as needed (is allergic to Prilosec and it is ineffective)
Hydrocodine/APAP (Vicodin), 5/500 tablet, every four hours when needed for back pain
Diazepam (Valium), 10 mg., when needed for tension
Flurazepam (Dalmane), 30 mg., as needed at bedtime
Prochlorperazine (Compazine), 10 mg., as needed when nauseous
Bellatal ER (Donnatal), as needed for stomach cramping
Carisoprodol Compound Tab AMP (Soma Compound), muscle relaxant as needed
Clotrimazole and Betamethasone Diproprionate Cream USP, twice daily to groin, when needed
Ambien CR, as needed, for sleep
Lidocaine Hydrochloride Oral Topical solution USP 2% 100 ml. viscous



# DRUGS.COM

## What's inside Bellatal ER

**Bellatal ER Active Ingredients:** atropine sulfate, hyoscyamine sulfate, phenobarbital, scopolamine hydrobromide, *details*.

### Bellatal ER Dosages & Strengths

| Strength | Format | Route | Strength | Class |
|---|---|---|---|---|
| Bellatal ER 0.0582 mg-0.3111 mg-48.6 mg-0.0195 mg | tablet, extended release | oral | 1.0 each | OTC |

### Drug Information For: BELLATAL ER TABLETS

**Ingredient Name:** ATROPINE (A-troe-peen), HYOSCYAMINE (hye-oh-SYE-a-meen), SCOPOLAMINE (skoe-POL-a-meen), and PHENOBARBITAL (fee-noe-BAR-bi-tal)

**Drug Manufacturer:** QUALITEST

**Common Uses:** This medicine is an antispasmodic and barbiturate combination used to relieve stomach and intestinal spasms and cramping. It may also be used to treat other conditions as determined by your doctor.

**Before Using This Medicine:** Some medicines or medical conditions may interact with this medicine. INFORM YOUR DOCTOR OR PHARMACIST of all prescription and over-the-counter medicine that you are taking. ADDITIONAL MONITORING OF YOUR DOSE OR CONDITION may be needed if you are taking quinidine, anticoagulants, corticosteroids, birth control pills, theophylline, valproic acid, doxycycline, metronidazole, or medicine for high blood pressure or heart conditions (beta blockers) or for emotional conditions (phenothiazines). Inform your doctor of any other medical conditions, allergies, pregnancy, or breast-feeding. USE OF THIS MEDICINE IS NOT RECOMMENDED if you have a history of megacolon or porphyria. Contact your doctor or pharmacist if you have any questions or concerns about using this medicine.

**How to Use This Medicine:** Follow the directions for using this medicine provided by your doctor. SWALLOW WHOLE. Do not break, crush, or chew before swallowing. Take this medicine on an empty stomach unless instructed otherwise by your doctor. STORE THIS MEDICINE at room temperature in a tightly-closed container, away from heat and light. IF YOU MISS A DOSE OF THIS MEDICINE, take it as soon as possible. If it is almost time for your next dose, skip the missed dose and go back to your regular dosing schedule. Do not take 2 doses at once.



**Cautions:** THIS MEDICINE WILL ADD TO THE EFFECTS of alcohol and other depressants. Ask your pharmacist if you have questions about which medicines are depressants. THIS MEDICINE MAY CAUSE drowsiness or dizziness. Do not drive, operate machinery, or do anything else that could be dangerous until you know how you react to this medicine. THIS MEDICINE MAY REDUCE SWEATING. Use caution to not become overheated while you are taking this medicine. FOR WOMEN TAKING BIRTH CONTROL PILLS: this medicine may decrease the effectiveness of your birth control pills. To prevent pregnancy, use an additional form of birth control while you are taking this medicine. FOR WOMEN: THIS MEDICINE HAS BEEN SHOWN TO CAUSE HARM to the human fetus. IF YOU PLAN ON BECOMING PREGNANT, discuss with your doctor the benefits and risks of using this medicine during pregnancy. THIS MEDICINE IS EXCRETED IN BREAST MILK. DO NOT BREAST-FEED while taking this medicine.

**Possible Side Effects:** SIDE EFFECTS, that may go away during treatment, include dizziness; drowsiness; dry mouth or throat; blurred vision; changes in taste perception; decreased sweating; dry skin or nose, or constipation. If they continue or are bothersome, check with your doctor. CHECK WITH YOUR DOCTOR AS SOON AS POSSIBLE if you experience vomiting or difficulty urinating. If you notice other effects not listed above, contact your doctor, nurse, or pharmacist. This is not a complete list of all side effects that may occur. If you have questions about side effects, contact your healthcare provider. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**Overdose:** If overdose is suspected, contact your local poison control center or emergency room immediately. Symptoms of overdose may include headache, nausea, vomiting, blurred vision, dilated pupils, hot and dry skin, drowsiness, dizziness, difficulty swallowing, seizures, and loss of consciousness.

**Additional Information:** DO NOT SHARE THIS MEDICINE with others for whom it was not prescribed. DO NOT USE THIS MEDICINE for other health conditions. KEEP THIS MEDICINE out of the reach of children. IF USING THIS MEDICINE FOR AN EXTENDED PERIOD OF TIME, obtain refills before your supply runs out.

Copyright 2010 Wolters Kluwer Health, Inc.





# CORNELL

## MEMORANDUM

**DATE:**    7/28/10

**TO:**      Wes Mayhew-CCM.

**FROM:**    Mike Reed- Director   *m. Reed*

**CC:**      File

**SUBJECT:** Yagman-43263-112   CDC waiver

Inmate Yagman was considered a flight risk due to his offense resulting in a return to close custody. As a result, the Incident Report was not served to him within 24 hrs of the incident. We respectfully request a waiver for that part of the CDC process.



Cornell Companies, Inc. · *Marvin Gardens Center* · 9411 S. Central Ave. Los Angeles California 90002
323-563-1126 · Fax 323-563-2164 · www.cornellcompanies.com



DECLARATION OF STEPHEN YAGMAN

I, STEPHEN YAGMAN, declare the following to be true under the penalty of perjury, pursuant to 28 U.S.C. 1746, at Los Angeles, California on July 25, 2010.

1. I am a federal Bureau of Prison's prisoner whose register number is 43263-112. I am 65 and a half years old. My CV is attached hereto, its contents are accurate, and they are incorporated herein by this reference.

2. Because I am not in physical circumstances to personally sign this declaration, I shall have e-mailed it to my lawyer, Marion R. Yagman, and I authorize her to affix my signature stamp, that she has, to it, in the event I shall not have gotten it back in time to sign it.

3. On November 27, 2007, I was sentenced to a term of imprisonment of 36 months.

4. I reported to the Butner, North Carolina prison camp on March 31, 2008, on which date my "out date" was calculated to be November 8, 2010, based on a calculation of projected "good time" credit.

5. In 2009, I was given a May 13, 2010 date to report to a half-way house at 9411 South Central Ave., Los Angeles 90001, whose name is Cornell Companies Marvin Gardens, and also was given a date of July 23, 2010 to be eligible for transfer from that half-way house to home confinement.

6. I had no difficulties of any kind at the half-way house.

7. On or about May 18, 2010, I began regularly working at my old law firm, Yagman & Yagman & Reichmann as a paralegal, working both at its office at 723 Ocean Front Walk in Venice and at my home office at 38 28th Avenue in Venice, and I continued that work schedule, Monday through Friday, 7:30 a.m. to 7:30 p.m., until a remarkable event on Friday, July 2.

8. At that time, I was taken into custody by two U.S. marshals, and told I had failed a urine test because I had tested positive for a barbiturate, phenobarbital. I never in my life have taken phenobarbital. I never in my life have taken any non-prescription drug.

9. I was brought to the Los Angeles Metropolitan Detention Center (MDC) and I was puzzled by what had happened.

10. I was not served with any statement of charges, and merely was verbally informed by one marshal of what had occurred.

11. On Wednesday, July 7, my case manager from the half-way house, Kim Fowler, came to the MDC and "served" me with a statement of charges, a copy of which is attached hereto.  Fowler told me there would be a hearing on the charge at 4:00 p.m. on that date, July 7, but there was none.  I told Fowler, in response to her inquiry whether I wanted to present any evidence or witnesses at the hearing, that I wanted to call as witnesses, half-way house employees Katherine Turner, to testify to matters I set forth hereinbelow, and I wanted my lawyers to served the charge on me, John Uyeda, chief of security, to testify to matters I set forth hereinbelow, and I wanted my lawyers to be able independently to test the subject urine sample.  She did not respond to this.

DECLARATION OF STEPHEN YAGMAN

I, STEPHEN YAGMAN, declare the following to be true under penalty of perjury, pursuant to 28 U.S.C. 1746, at Los Angeles, California, on July 30, 2010.

1. I am the petitioner in this action.

2. This morning, Friday, July 30, 2010, I learned that my "out date" from the BOP would be extended from Nov. 8, 2010 to Dec. 1, 2010, based on the matters set forth in my July 25 Declaration, and as punishment for the urine test that was positive for phenobarbital.

3. I immediately sought a "BP-10" form to appeal this determination to the BOP's Western Region, in Stockton, California. An appeal may not be filed except on that form, and an appeal not made on that form would be rejected out of hand.

4. I was unable to obtain that form because they are not made readily available and must be obtained only from the Correctional Counselor, who rarely is in attendance in section 6-S of the MDC. Her name is Brenda Burch, she is the only person who has the forms, and, as often is the case, she is not here today. Thus, I am unable to obtain the form and unable timely to appeal. Thus, I have exhausted "reasonably available" administrative remedies, though my understanding is that in the Ninth Circuit administrative remedies required otherwise to be exhausted under the PLRA need not be exhausted as a condition precedent to filing a habeas corpus petition pursuant to 28 U.S.C. 2241. I also asked the Corrections Officer assigned to this floor for a BP-10 form and he *they* responded he does not have one and that one may be obtained only from Counselor Burch who, as I indicated, is not here. *they Their names are Alcaraz and Maximo,*

5. Because time is of the essence in this matter and my counsel will be unable to get my signature on this Declaration in time to file it, I authorize my attorney, Marion R. Yagman, who has my signature stamp, to affix it to this Declaration.

STEPHEN YAGMAN

--------------------------------------------------------------------------------------------------------------------------

12. That was the first time I had seen the document, yet on it was an attestation that a low-level worker at the half-way house named Katherine Turner had given it to me on Friday, July 2, between 11:00 a.m. and noon, though the line for my signature to acknowledge having received it was blank. Ms. Fowler asked me to sign it on July 7, to attest that I had received it on July 2, but I declined because of the discrepancy in the date.

13. The BOP rules require that a prisoner be served with written charges of an alleged rule violation within 24 hours of the BOP learning of an alleged rules infraction, not counting the day the BOP learns of the infraction, and thus, having learned of the infraction on June 29, the BOP had until the end of the day on Wednesday, June 30, to serve me with the Incident Report. By not serving me, my due process right was violated. The rules governing service of Incident Reports and hearings are set forth at pages 38-39 of the Admission and Orientation Handbook for the MDC-Los Angeles, are uniform throughout the BOP, and provide the following:

"Inmate Discipline Information: I f a staff member observes or believes
he or she has evidence that an inmate has committed a prohibited act,
the first step in the disciplinary process is writing an incident report.
This is a written copy of the charges against the inmate. The incident
report shall ordinarily be delivered to the inmate within (24) hours of
the time staff becomes aware of the inmate's involvement in the
incident. . . . .

"Initial Hearing: Inmates must ordinarily be given an initial hearing
within three working days of the time staff become aware of the inmate's involvement in the incident (excluding the day staff
become aware of the incident, weekends, and holidays). . . . The UDC [Unit Disciplinary Committee] must give its decision in
writing to the inmate by the close
of business the next work day. The UDC may extend the time limits of
these procedures for good cause. The Warden must approve any
extension over 5 days. The inmate must be provided with written
reasons for any extension. The UDC will either make final disposition
of the incident, or refer it to the DHO [Disciplinary Hearing Officer] for final disposition."

None of these time limits or procedures was followed. The infraction was learned of on June 29, and therefore, the Incident Report was to have been served no later than June 30. The hearing was required to have been held by the end of July 2, but it was not held until July 8, more than 5 days after it was required to have been held. No decision in writing, or any decision at all, was rendered or served, much less by the required time. No extension of time was sought, and no approval for any extension was given by a warden or similar official. No written reasons for any extension were given. The UDC held a hearing out of time and apparently made no final decision and did not refer the matter to a DHO. I did not waive any requirement.

Thus, my due process rights were violated at least in the following respects:

A. I was not served with the Incident Report within 24 hours, but was served over five days later;

B. The initial hearing was not held within three work days, but instead was held within six work days;

C. No extensions of time were sought or granted, much less was any good cause for any extension sought;

D. I was not permitted to call Katherine Turner as a witness to corroborate my statement that I was not served with the incident report on July 2, as she falsely stated on that Report;

E. I was not permitted to call John Uyeda as a witness to corroborate my statement that he authorized me to take prescription medications whose names were set forth on the list I presented to him on May 13; and,

F. I was not permitted to test the urine sample that allegedly tested positive for phenobarbital.

14. On Thursday, July 8, another case manager from the half-way house, Kevin Kincey, came to MDC and held a "hearing." I reiterated that I wanted the witnesses whose names are set forth above and an opportunity to test the urine sample, and his response was that I could not call the witnesses or have an independent test done on the urine.

15. He held the "hearing," at which I told him the following: I had no idea why the urine sample tested positive for phenobarbital, but, if it tested for phenobarbital, then the only explanation of which I then could think would be that I could have taken a prescription Donnatal (also called Bellatal) pill for an upset stomach, for which I had a prescription (a copy of which is attached hereto), but that I did not remember having taken such a pill; that when I checked into the Butner prison camp, I had provided the intake person with both a list of all medications for which I had prescriptions (a copy of which is attached hereto) as well as all the medications, the list was made part of by BOP file, and the medications were confiscated; that when John Uyeda checked me into the half-way house on the evening of May 13, 2010, I had given him the same list of my medications, and was told by him I could take all medications for which I had prescriptions, and that once he had seen the list he did not need to retain a copy; Uyeda gave me no listing of half-way house rules.

16. The July 8 "hearing" was required by BOP rules to have been held within 3 work days of when the BOP learned of the alleged infraction, but it was not, thus violating by due process right.

17. I heard nothing again of the "hearing," or of its disposition.

18. On Monday, July 12, I was told I would be transferred from MDC, but was not told to where.

TRULINCS  43263112 - YAGMAN, STEPHEN - Unit: LOS-F-S
----------------------------------------------------------------------------------------------------------------------

19. On Thursday, July 15, I was awakened at 5:00 a.m. and taken by bus to Victorville Airport and told I was being flown to Oklahoma City and then to Butner, North Carolina. No one would answer any of my questions about what was going on or why. I became very anxious.

20. At about noon on July 15, I was told I was being taken to the San Bernardino County jail, at which I arrived at 1:00 p.m.  From 5:00 a.m. until 1:00 p.m., I was shackled hand and foot.

21. I was not booked into the San Bernardino County jail until 10:00 p.m. on July 15.  I was put in a 8' x 13' cell and in a bunk whose height was approximately three feet from bottom to top, with a solid sheet metal top. It was like a coffin, open only on one side.  I became very claustrophobic and anxious.

22. At about 3:00 a.m. on July 16, I awakened, believing I had been buried alive, and then woke up on the floor, with severe chest pain and severe pain down my left upper and lower arm.

23. Someone summoned a jailor, a electrocardiogram was done, and I was ordered sent, chained hand and foot, to Arrowhead Regional Medical Center, in Colton, where I spent all day on Friday, July 16 in the emergency room, and where I was admitted late that day.

24. I remained under guard in a room, and never got out of bed, until Monday, July 19.  Numerous tests where done on me, including electrocardiograms, an echo cardiogram, and a stress test. The result of the latter tests was that there was a "low [then-current] probability of CVD." I believe I suffered a minor heart attack, but this neither could be confirmed nor denied. During the period July 14-20, I lost approximately 15 pounds of my usual 215 pound weight.  I now look haggard and tired, which I am.  I was ordered discharged from the hospital.

25. At 7:00 p.m., I was re-admitted to the San Bernardino County jail and placed back into a protective custody cell, and then awakened at 3:00 a.m., and told I was being transferred back to MDC, to which I was taken at 5:00 a.m.

26. I was supposed to be released from the half-way house to home confinement on Friday, July 23, but that did not occur.

27. I have been given no information about the disciplinary charge against me, that is taking medication that was not prescribed by the half-way house, *as of July 25, 2010,*

though the half-way house couldn't prescribe any medication for me.  *See additional 08/04/10 Declaration.*

STEPHEN YAGMAN

FROM: 43263112
TO: Yagman, Marion
SUBJECT: appeal of discipline
DATE: 8/4/2010 6:09:33 PM

STEPHEN YAGMAN

                              43263-112
                              Box 1500
                              L.A., CA 90053

August 4, 2010

Robert McFadden
Regional Director, BOP
7338 Shoreline Drive
Stockton, CA 95219

Re: Appeal of 2046414

Dear Mr. McFadden:

This letter is written to appeal from the disposition of the above-numbered disposition, pursuant to the advisement at page of the CDC's Report that an appeal may be taken "by letter within 20 days of the imposition of the sanction to the Regional Director." I am unable to attach the 30 pages of papers served on me today because I am unable to make copies of them and do not want to relinquish the only copy I have. I understand that you have or may access the complete packet of 30 pages given to me.

My appeal is based on the following:
1. The halfway house medication policy, page 10 of the packet, didn't apply to my conduct and didn't prohibit my conduct, that is, taking at work prescription medication for a very bad stomach ache, or, as in this instance, prescription medication I notified both the BOP (when I entered the camp at Butner on March 31, 2008) I was taking (and of which I gave them a list -- the same list, dated 03/31/08 -- I also provided to the halfway house intake person, John Uyeda, when I checked in there on May 13, 2010). It doesn't apply to prescription medication not taken into and not taken in the halfway house. The policy stresses that "ANY MEDICATION . . . [SHOULD NOT BE TAKEN] TO YOUR ROOM WITHOUT STAFF APPROVAL." I never had the medication at the halfway house, nor did I take the one pill at the halfway house. I simply didn't commit a prohibited offense.

I provided John Uyeda, who did the intake on me, with the list of medications I was taking at intake, at page 27 of the packet given to me, as I had to the camp at Butner, and he authorized me to take all the listed medications, but when I asked to call him as a witness, that was refused. This was a denial of due process and my stated right to call witnesses.

2. The Incident Report wasn't served on me until July 7, 2010, past the required time, and though Katherine Turner signed a paper in which she said she served me on July 2, that statement was false, as is admitted by the last page of the packet, p. 30, in which a waiver of timely service was sought, after the fact, and when it was realized that Turner didn't tell the truth. Her statements and the waiver are irreconcilably in conflict.

3. The hearing was held both too late and too early because it wasn't held by when it was supposed to be held and also because it was held less than 24 hours after the Incident Report finally was served on me on July 7, 2010 at 11:45 a.m. and then the hearing was held on July 8, 2010 at 10:30 a.m.

4. Both nos. 2 and 3 prejudiced me in having time to gather evidence, to wit, the pharmacy records and witnesses, my doctor, and in being able to prepare a defense.

5. I had no opportunity to test the urine sample or to have an independent urine sample done, as I never stated unequivocally that I took Donnatol or Bellatol, but only that "if the test was correct," then my having taken it for a stomach ache I remembered would be the only explanation for the negative urine test. I had no opplortunity to cross-examine the person(s) who did the testing, and a recent U.S. Supreme Court case (whose name at this moment I can't remember) stands for the proposition that persons cannot be convicted based on scientific evidence unless the person who, himself has done the testing can be examined: that is, the simple

use of a report is insufficient to sustain a conviction. I believe this principle applies to my situation.

6. There is no halfway house medical staff to prescribe medication, and in the emergency I had of a very bad upset stomach, it was not unreasonable for me to take one prescription pill for that. I did not knowingly or intentionally violate any rule. Moreover, the subject incident didn't occur at a "facility," as is set forth at #6 of the Incident Report, but occurred when I took the pill at my home, where I was authorized to be working on June 21 and June 22.

7. In conclusion, I didn't knowingly or intentionally violate any rule or policy at all; I was authorized both by my physician and John Uyeda to take the subject medication and it was not unreasonable for me to have taken it (if, in fact I did, and that is the only possible explanation, if the urine test result is accurate); and I should have gone to home confinement on July 23, as authorized, and should not have been taken into custody, found culpable, have 40 good time days taken away, and have to remain in prison from now until Dec. 11, 2010, based on what occurred, because that is unreasonable.

Please promptly review this matter and send me to home confinement or back to a halfway house and expunge this matter from my record. I never, ever have taken any non-prescription medication, in my entire life -- I'm nearly 66 years old -- nor have I ever taken any illegal drug, nor do I drink alcohol. This entire matter seems to me to be absurd. Thank you.

Sincerely,

STEPHEN YAGMAN

## MEDICATIONS-STEPHEN YAGMAN 03-31-08

\*Avapro, 300 mg., (heart) every morning before eating
\*Lipitor, 80 mg., (heart, high blood pressure) every morning before eating
\*Hydrochlorothiazide, 25 mg. (heart, diuretic) every morning before eating
\*Levothyroxine, 0.150 mg. (low thyroid disease) every morning before eating
\*Metoprolol Succ ER, 100 mg. every evening before going to sleep
Nexium, 40 mg. (stomach/duodenal ulcers and antral spots), as needed (is allergic to Prilosec and it is ineffective)
Hydrocodine/APAP (Vicodin), 5/500 tablet, every four hours when needed for back pain
Diazepam (Valium), 10 mg., when needed for tension
Flurazepam (Dalmane), 30 mg., as needed at bedtime
Prochlorperazine (Compazine), 10 mg., as needed when nauseous
Bellatal ER (Donnatal), as needed for stomach cramping
Carisoprodol Compound Tab AMP (Soma Compound), muscle relaxant as needed
Clotrimazole and Betamethasone Dipropionate Cream USP, twice daily to groin, when needed
Ambien CR, as needed, for sleep
Lidocaine Hydrochloride Oral Topical solution USP 2% 100 ml. viscous

# DRUGS.COM

## What's inside Bellatal ER

**Bellatal ER Active Ingredients:** atropine sulfate, hyoscyamine sulfate, phenobarbital, scopolamine hydrobromide, *details*.

### Bellatal ER Dosages & Strengths

| Strength | Format | Route | Strength | Class |
|---|---|---|---|---|
| Bellatal ER 0.0582 mg-0.3111 mg-48.6 mg-0.0195 mg | tablet, extended release | oral | 1.0 each | OTC |

### Drug Information For: BELLATAL ER TABLETS

**Ingredient Name:** ATROPINE (A-troe-peen), HYOSCYAMINE (hye-oh-SYE-a-meen), SCOPOLAMINE (skoe-POL-a-meen), and PHENOBARBITAL (fee-noe-BAR-bi-tal)

**Drug Manufacturer:** QUALITEST

**Common Uses:** This medicine is an antispasmodic and barbiturate combination used to relieve stomach and intestinal spasms and cramping. It may also be used to treat other conditions as determined by your doctor.

**Before Using This Medicine:** Some medicines or medical conditions may interact with this medicine. INFORM YOUR DOCTOR OR PHARMACIST of all prescription and over-the-counter medicine that you are taking. ADDITIONAL MONITORING OF YOUR DOSE OR CONDITION may be needed if you are taking quinidine, anticoagulants, corticosteroids, birth control pills, theophylline, valproic acid, doxycycline, metronidazole, or medicine for high blood pressure or heart conditions (beta blockers) or for emotional conditions (phenothiazines). Inform your doctor of any other medical conditions, allergies, pregnancy, or breast-feeding. USE OF THIS MEDICINE IS NOT RECOMMENDED if you have a history of megacolon or porphyria. Contact your doctor or pharmacist if you have any questions or concerns about using this medicine.

**How to Use This Medicine:** Follow the directions for using this medicine provided by your doctor. SWALLOW WHOLE. Do not break, crush, or chew before swallowing. Take this medicine on an empty stomach unless instructed otherwise by your doctor. STORE THIS MEDICINE at room temperature in a tightly-closed container, away from heat and light. IF YOU MISS A DOSE OF THIS MEDICINE, take it as soon as possible. If it is almost time for your next dose, skip the missed dose and go back to your regular dosing schedule. Do not take 2 doses at once.

**Cautions:** THIS MEDICINE WILL ADD TO THE EFFECTS of alcohol and other depressants. Ask your pharmacist if you have questions about which medicines are depressants. THIS MEDICINE MAY CAUSE drowsiness or dizziness. Do not drive, operate machinery, or do anything else that could be dangerous until you know how you react to this medicine. THIS MEDICINE MAY REDUCE SWEATING. Use caution to not become overheated while you are taking this medicine. FOR WOMEN TAKING BIRTH CONTROL PILLS: this medicine may decrease the effectiveness of your birth control pills. To prevent pregnancy, use an additional form of birth control while you are taking this medicine. FOR WOMEN: THIS MEDICINE HAS BEEN SHOWN TO CAUSE HARM to the human fetus. IF YOU PLAN ON BECOMING PREGNANT, discuss with your doctor the benefits and risks of using this medicine during pregnancy. THIS MEDICINE IS EXCRETED IN BREAST MILK. DO NOT BREAST-FEED while taking this medicine.

**Possible Side Effects:** SIDE EFFECTS, that may go away during treatment, include dizziness; drowsiness; dry mouth or throat; blurred vision; changes in taste perception; decreased sweating; dry skin or nose, or constipation. If they continue or are bothersome, check with your doctor. CHECK WITH YOUR DOCTOR AS SOON AS POSSIBLE if you experience vomiting or difficulty urinating. If you notice other effects not listed above, contact your doctor, nurse, or pharmacist. This is not a complete list of all side effects that may occur. If you have questions about side effects, contact your healthcare provider. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088.

**Overdose:** If overdose is suspected, contact your local poison control center or emergency room immediately. Symptoms of overdose may include headache, nausea, vomiting, blurred vision, dilated pupils, hot and dry skin, drowsiness, dizziness, difficulty swallowing, seizures, and loss of consciousness.

**Additional Information:** DO NOT SHARE THIS MEDICINE with others for whom it was not prescribed. DO NOT USE THIS MEDICINE for other health conditions. KEEP THIS MEDICINE out of the reach of children. IF USING THIS MEDICINE FOR AN EXTENDED PERIOD OF TIME, obtain refills before your supply runs out.

Copyright 2010 Wolters Kluwer Health, Inc.

FROM WEB MD

## BELLATAL ER Oral

Important Note: The following information is intended to supplement, not substitute for, the expertise and judgment of your physician, pharmacist or other healthcare professional. It should not be construed to indicate that use of the drug is safe, appropriate, or effective for you. Consult your healthcare profes-sional before using this drug.

## BELLADONNA ALKALOIDS / PHENOBARBITAL - ORAL

PRONUNCIATION: (bell-a-DON-a al-KA-loyd/fee-noe-BAR-bi-tal)
Review this Drug3 User Reviews



- **Who should not take BELLATAL ER Oral?**

### BELLATAL ER ORAL USES

This product contains several medications: belladonna alkaloids (made up of the drugs hyoscyamine, atropine, and scopolamine) and phenobarbital. Belladonna alkaloids help to reduce the symptoms of stomach and intestinal cramping. They work by slowing the natural movements of the gut and by relaxing the muscles in the stomach and intestines. Belladonna alkaloids belong to a class of drugs known as anticholinergics/antispasmodics. Phenobarbital helps to reduce anxiety. It acts on the brain to produce a calming effect. Phenobarbital belongs to a class of drugs known as barbiturate sedatives.
OTHER USES: This section contains uses of this drug that are not listed in the approved professional labeling for the drug but that may be prescribed by your health care professional. Use this drug for a condition that is listed in this section only if it has been so prescribed by your health care professional. This drug may also be used to relieve the symptoms of irritable bowel syndrome.

### How to use BELLATAL ER Oral

Take this medication by mouth as directed by your doctor. If you are taking the immediate-release tablets or liquid form of this medication, take it usually 3 to 4 times a day or as directed by your doctor.
If you are using the liquid, carefully measure the dose using a special measuring device/spoon. Do not use a household spoon because you may not get the correct dose.
If you are taking the extended-release tablets, take them usually every 12 hours or as directed by your doctor. Swallow the extended-release tablets whole. Do not crush, chew, or break the tablets. Doing so can release all of the drug at once, increasing the risk of side effects.
Antacids lower the absorption of this medication. If you are taking an antacid, take it at least 2 hours apart from this medication.
The dosage is based on your medical condition and response to treatment. In children, the dosage is also based on weight.
Do not increase your dose or take this drug more often without your doctor's approval. Your condition will not improve any faster and the risk of serious side effects may increase.
This medication may cause withdrawal reactions, especially if it has been used regularly for a long time or in high doses. In such cases, withdrawal symptoms (such as anxiety, muscle twitching, shakiness, dizziness, worsening weakness, nausea, vomiting) may occur if you suddenly stop using this medication. Withdrawal from the phenobarbital can be severe and include seizures and (rarely) death. To prevent withdrawal reactions, your doctor may reduce your dose gradually. Consult your doctor or pharmacist for more details, and report any withdrawal reactions immediately.
When this medication is used for a long time, it may not work as well. Your doctor may need to increase your dose or change your medication. Talk with your doctor if this medication stops working well.
Along with its benefits, this medication may rarely cause abnormal drug-seeking behavior (addiction). This risk may be increased if you have abused alcohol or drugs in the past. Take this medication exactly as prescribed to lessen the risk of addiction.
Tell your doctor if your condition persists or worsens.

## YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to:  Kevin Kency | From:  Marion R. Yagman |
|---|---|
| Attention | Date:  July 9, 2010 |
| Office location: | Office location: |
| Fax number:  323-563-2164 | Phone number: (310) 397-4714<br>Fax:  310-397-0611 |

Re:  Stephen Yagman,

Dear Mr. Kency:  Attached please find a copy of a prescription for Donnatal Extentabs prescribed by Dr. Michael Bush for Stephen Yagman, which I obtained as part of Mr. Yagman's medical records. Marion R. Yagman

---

### CONFIDENTIALITY NOTICE

This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed.  This communication contains information that may be privileged, confidential and exempt from disclosure under applicable law.  If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution, or other use of this communication is strictly prohibited.  If you have received this communication by mistake, please notify the sender immediately by fax or by telephone and destroy all forms of this communication.

# REGISTRATION    GELLER, RUDNICK, BUSH & BAMBERGER
## A MEDICAL CORPORATION

PLEASE PRINT

Date: _08/02/04_                          Home Phone _____        Cell: _____

Patient Name _____YAGMAN_____ _____STEPHEN_____ _____
                   Last Name              First Name              Middle Initial

Responsible Party if minor _____

Street Address __723 Ocean Front Walk_____

City _Venice Beach_____    State _CA_                      Zip _90291-3220_

E-Mail _____    Driver's License # _____

BILLING ADDRESS IF DIFFERENT _____

---

Sex __M__ F  Age ___  Birthdate _12/19/44_    Single  Married  Widowed  Seperated  Divorce

Patient Employed by _Yagman & Yagman & Reichmann_____

Business Address _Same as above_____

Occupation _lawyer_____              Business Phone _(310) 492-3200_

Spouse Name (or responsible party) _____    Birthdate _____

Business Name & Address _____

Occupation _____        Business Phone _____

Who is responsible for this account? _Stephen Yagman_    Relationship to patient _Self_

Social Security # _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_____    Spouse Social Security # _____

In case of emergency who should we notify? _____    Phone _____

Relationship _____    Address _____

Who referred you to our practice? _long-time patient_____

Do you have medical insurance? ___No  ✓Yes  If Yes, complete insurance info below.

Name/address of Primary Insurer _Blue Cross_    _(800) 333-0912_

Group # _PPO_____    Subscriber # _XDL 073A61563_

Name/address of Secondary Insurer (if any) _Claims: Box 60007, LA CA 90060_

Group # _____    Subscriber # _____

---

ASSIGNMENT AND RELEASE

I, the undersigned, have insurance coverage with, _Blue Cross_____ and assign directly to Drs. Geller, Rudnick, Bush an Bamberger all medical benefits, if any, otherwise payable to me for services rendered. I understand that I am financially responsible for all charges wheth or not paid by insurance. I hereby authorize the doctor to release all information necessary to secure payment of benefits. I authorize the use of this signat on all my medical insurance submissions.

_____Stephen Yagman_____        _08/02/04_
Signature of Insured/Guardian            Date

MEDICARE AUTHORIZATION

I request that payment of authorized Medicare benefits be made either to me or on my behalf to Drs. Geller, Rudnick, Bush and Bamberger for any servic furnished me by these physicians. I authorize any holder of medical information about me to release to the Health Care Financing Administration and its agents any information needed to determine these benefits or the benefits payable for related services. I understand my signature requests that payment be made and authorizes release of medical information necessary to pay the claim. If "other health insurance" is indicated in item 9 of HCFA 1500 form, or elsewhere on other approved claim forms or electronically submitted claims, my signature authorizes releasing information to the insurer or agency shown

_____        _____
Beneficiary Signature            Date



```
┌─────────────────────────────────────────┐
│ TRANSMISSION VERIFICATION REPORT          │
└─────────────────────────────────────────┘
```

```
                                    TIME  : 07/09/2010 16:59
                                    NAME  :
                                    FAX   :
                                    TEL   :
                                    SER.# : BROK3J753289
```

```
    DATE,TIME          07/09  16:58
    FAX NO./NAME       13235632164
    DURATION           00:00:54
    PAGE(S)            03
    RESULT             OK
    MODE               STANDARD
                       ECM
```

## YAGMAN & YAGMAN & REICHMANN
723 Ocean Front Walk
Venice, CA 90291
(310) 452-3200

| Send to: Kevin Kency | From:  Marion R. Yagman |
|---|---|
| Attention | Date: July 9, 2010 |
| Office location: | Office location: |
| Fax number: 323-563-2164 | Phone number: (310) 397-4714<br>Fax: 310-397-0611 |

Re: Stephen Yagman,

Dear Mr. Kency: Attached please find a copy of a prescription for Donnatal Extentabs prescribed by Dr. Michael Bush for Stephen Yagman, which I obtained as part of Mr. Yagman's medical records. Marion R. Yagman

CONFIDENTIALITY NOTICE



**Metropolitan Detention Cente**
**Los Angeles, CA**

— Copy cover & Dig-barred pgs.
Cover top 38-42 asterisked *

| TABLE 3 | | |
| --- | --- | --- |
| **Greatest Category** | | |
| | | Sanctions |
| Code | Prohibited Acts | A - G |
| 100 | Killing | |
| 101 | Assaulting any person (includes sexual assault) or armed assault on the institution's secure perimeter (a charge for assaulting any person is to be used only when serious physical injury has been attempted or carried out by an inmate) | A - G |
| 102 | Escape from escort; escape from a secure institution, or escape from a minimum institution <u>with</u> violence | A - G |
| 103 | Setting a fire (charged with this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Severity, e.g., in furtherance of a riot or escape; otherwise the charge is properly classified code 218 or 329) | A - G |
| 104 | Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, or any ammunition | A - G |
| 105 | Rioting | A - G |
| 106 | Encouraging others to riot | A - G |
| 107 | Taking hostage(s) | A - G |
| 108 | Possession, manufacture, or introduction of a hazardous tool (tools most likely to be used in an escape or escape attempt or to manufacture or serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hacksaw blade). | A - G |
| 110 | Refusing to provide a urine sample or to take part in other drug abuse testing | A - G |
| 111 | Introduction of any narcotic, marijuana, drugs or related paraphernalia not prescribed for the individual by the medical staff | A - G |
| 112 | Use of any narcotic, marijuana, drugs or related paraphernalia not prescribed for the individual by the medical staff | A - G |
| 113 | Possession of any narcotic, marijuana, drugs or related paraphernalia not prescribed for the individual by the medical staff | A - G |



42



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**TERRY NAFISI**
District Court Executive
and Clerk of Court

Friday, August 06, 2010

**STEPHEN YAGMAN**
**#43263-112**
**P. O. BOX 1500**
**LA, CA. 90053**

Dear Sir/Madam:

A  X  Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number
         CV10- 5860 SVW (CW)

A  [  ]  Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case
         number _____ and also assigned the civil case number _____

A  ----  Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and
         assigned civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:
   [  ] District Court Judge _____
    X  Magistrate Judge _____**Carla Woehrle**_____
at the following address:

   X  U.S. District Court          [  ] Ronald Reagan Federal          U.S. District Court
      312 N. Spring Street              Building and U.S. Courthouse     3470 Twelfth Street
      Civil Section, Room G-8          411 West Fourth St., Suite 1053  Room 134
      Los Angeles, CA  90012           Santa Ana, CA  92701-4516        Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change.  If mail directed to your
address of record is returned undelivered by the Post Office, and if the Court and opposing counsel
are not notified in writing within fifteen (15) days thereafter of your current address, the Court may
dismiss the case with or without prejudice for want of prosecution.

                           Very truly yours,

                           Clerk, U.S. District Court


                     By:  ____**CSAWYER**_____
                           Deputy Clerk


CV-17 (06/09)          **LETTER re FILING H/C PETITION or 28/2255 MOTION**