TRULINCS 43263112 - YAGMAN, STEPHEN - Unit: LOS-F-S

----------------------------------------------------------------------------------------------------

FROM: 43263112
TO: Yagman, Marion
SUBJECT: 2241
DATE: 8/8/2010 4:56:16 PM

STEPHEN YAGMAN
43263-112
Metropolitan Detention Center
Box 1500
Los Angeles, California 90053

# ORIGINAL



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

STEPHEN YAGMAN,                                   No. CV-10-5860-SVW-CW

Petitioner,                                       SECOND AMENDMENT TO SECTION 2241 PETITION

v.                                                Mag. Judge Carla Woehrle

ERWIN MEINBERG, etc.,

Respondent.

Because the Section 2241 petition was drafted hurriedly, easily-read copies of some exhibits were not attached, and they now are attached hereto.

Respectfully submitted,

STEPHEN YAGMAN 08/08/10

# DECLARATION OF STEPHEN YAGMAN

I, STEPHEN YAGMAN, declare the following to be true under penalty of perjury, pursuant to 28 U.S.C. 1746, at Los Angeles, California, on July 30, 2010.

1. I am the petitioner in this action.

2. This morning, Friday, July 30, 2010, I learned that my "out date" from the BOP would be extended from Nov. 8, 2010 to Dec. 13, 2010, based on the matters set forth in my July 25 Declaration, and as punishment for the urine test that was positive for phenobarbital.

3. I immediately sought a "BP-10" form to appeal this determination to the BOP's Western Region, in Stockton, California. An appeal may not be filed except on that form, and an appeal not made on that form would be rejected out of hand.

4. I asked Correctional Officers Alcaraz (the 6:00 a.m. to 2:00 p.m. shift) and Maximo (the 2:00 p.m. to 10:00 p.m. shift) for a BP-10 form, and each of them told me that they did not have one and that the forms could be obtained only from the Counselor, who is not here.

5. I was unable to obtain that form because they are not made readily available and must be obtained only from the Correctional Counselor, who rarely is in attendance in section 6-S of the MDC. Her name is Brenda Burch, she is the only person who has the forms, and, as often is the case, she is not here today. Thus, I am unable to obtain the form and unable timely to appeal. Thus, I have exhausted "reasonably available" administrative remedies, though my understanding is that in the Ninth Circuit administrative remedies required otherwise to be exhausted under the PLRA need not be exhausted as a condition precedent to filing a habeas corpus petition pursuant to 28 U.S.C. 2241. I also asked the Corrections Officer assigned to this floor for a BP-10 form and he

1

1  responded he does not have one and that one may be obtained only from Counselor

2  Burch who, as I indicated, is not here.

3

4

5                         STEPHEN YAGMAN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF STEPHEN YAGMAN

I, STEPHEN YAGMAN, declare the following to be true under penalty of perjury at Los Angeles, California on August 4, 2010, pursuant to 28 U.S.C. 1746.

1. Attached hereto is a copy of the disciplinary packet I received this morning, and I have numbered its pages with numbers in circles at the bottom of each page.

2. Also, attached hereto are handwritten notes I made as to the significance of each page's contents, and I incorporate those notations herein by this reference.

3. Also, attached hereto are handwritten notations explaining my claims.

4. In short, I contend that I am being held under conditions of confinement that violate my due process right under the Fifth Amendment, and specifically because, in addition to the contentions set forth in my two, earlier Declarations, that I was found culpable for an offense that does not exist as a violation of the halfway house rules: taking a prescription medication while I was authorized to work at my home and the taking of which clearly did not violate the statement of the halfway house rules on medications that I was given and that I signed. I was not given notice, nor did I know, that my taking of a prescription medication -- Donnatal or Bellatal -- and the taking of which I gave notice of to the halfway house upon my entry on May 13, 2010.

5. On May 13, 2010, at approximately 7:00 p.m., I presented to the intake person at the halfway house, John Uyeda, the March 31, 2008 listing of medications for which I had prescriptions that I also gave to the camp intake officer at Butner, North Carolina, upon my intake there on March 31, 2008, and advised him that the medications with asterisks next to them were taken daily by me (and that I had those with me) and that the others were taken as needed. He told me that I had to give to him for making the ones I had with me, and that so long as

1

I would not bring any of the others into the halfway house I could take them as prescribed. That is precisely what I did.

6. I had no notice and no reason to believe that I could not take a Donnatal or Bellatal as needed: had I had any such notice, I would not have taken one.

7. What is happening to me is Kafkaesque and absurd. I did not inappropriately take Donnatal or Bellatal, and I had no notice I could not take one. The applicable rules did not prohibit me from taking that medication, yet I have been found culpable of taking that medication, and therefore have been punished and am being confined by the BOP in violation of my right to due process, to wit, a process in which there is notice of that which is prohibited.

STEPHEN YAGMAN

2

## MEDICATIONS-STEPHEN YAGMAN 03-31-08

*Avapro, 300 mg., (heart) every morning before eating
*Lipitor, 80 mg., (heart, high blood pressure) every morning before eating
*Hydrochlorothiazide, 25 mg. (heart, diuretic) every morning before eating
*Levothyroxine, 0.150 mg. (low thyroid disease) every morning before eating
*Metoprolol Succ ER, 100 mg. every evening before going to sleep
Nexium, 40 mg. (stomach/duodenal ulcers and antral spots), as needed (is allergic to Prilosec and it is ineffective)
Hydrocodine/APAP (Vicodin), 5/500 tablet, every four hours when needed for back pain
Diazepam (Valium), 10 mg., when needed for tension
Flurazepam (Dalmane), 30 mg., as needed at bedtime
Prochlorperazine (Compazine), 10 mg., as needed when nauseous
Bellatal ER (Donnatal), as needed for stomach cramping
Carisoprodol Compound Tab AMP (Soma Compound), muscle relaxant as needed
Clotrimazole and Betamethasone Dipropionate Cream USP, twice daily to groin, when needed
Ambien CR, as needed, for sleep
Lidocaine Hydrochloride Oral Topical solution USP 2% 100 ml. viscous



**STEPHEN YAGMAN, 43263-112**
Box 1500
Los Angeles, CA 90053

August 4, 2010

Robert McFadden
Regional Director, BOP
7338 Shoreline Drive
Stockton, CA 95219

Re:  Appeal of 2046414

Dear Mr. McFadden:

    This letter is written to appeal from the disposition of the above-numbered disposition, pursuant to the advisement at page of the CDC's Report that an appeal may be taken "by letter within 20 days of the imposition of the sanction to the Regional Director."  I am unable to attach the 30 pages of papers served on me today because I am unable to make copies of them and do not want to relinquish the only copy I have. I understand that you have or may access the complete packet of 30 pages given to me.

    My appeal is based on the following:

    1.  The halfway house medication policy, page 10 of the packet, didn't apply to my conduct and didn't prohibit my conduct, that is, taking at work prescription medication for a very bad stomach ache, or, as in this instance, prescription medication I notified both the BOP (when I entered the camp at Butner on March 31, 2008) I was taking (and of which I gave them a list -- the same list, dated 03/31/08 -- I also provided to the halfway house intake person, John Uyeda, when I checked in there on May 13, 2010). It doesn't apply to prescription medication not taken into and not taken in the halfway house. The policy stresses that "ANY MEDICATION . . . [SHOULD NOT BE TAKEN] TO YOUR ROOM WITHOUT STAFF APPROVAL." I never had the medication at the halfway house, nor did I take the one pill at the halfway house. I simply didn't commit a prohibited offense.

Robert McFadden
Page Two
August 4, 2010

I provided John Uyeda, who did the intake on me, with the list of medications I was taking at intake, at page 27 of the packet given to me, as I had to the camp at Butner, and he authorized me to take all the listed medications, but when I asked to call him as a witness, that was refused. This was a denial of due process and my stated right to call witnesses.

2. The Incident Report wasn't served on me until July 7, 2010, past the required time, and though Katherine Turner signed a paper in which she said she served me on July 2, that statement was false, as is admitted by the last page of the packet, p. 30, in which a waiver of timely service was sought, after the fact, and when it was realized that Turner didn't tell the truth. Her statements and the waiver are irreconcilably in conflict.

3. The hearing was held both too late and too early because it wasn't held by when it was supposed to be held and also because it was held less than 24 hours after the Incident Report finally was served on me on July 7, 2010 at 11:45 a.m. and then the hearing was held on July 8, 2010 at 10:30 a.m.

4. Both nos. 2 and 3 prejudiced me in having time to gather evidence, to wit, the pharmacy records and witnesses, my doctor, and in being able to prepare a defense.

5. I had no opportunity to test the urine sample or to have an independent urine sample done, as I never stated unequivocally that I took Donnatal or Bellatal, but only that "if the test was correct," then my having taken it for a stomach ache I remembered would be the only explanation for the negative urine test. I had no opportunity to cross-examine the person(s) who did the testing, and a recent U.S. Supreme Court case (whose name at this moment I can't remember) stands for the proposition that persons cannot be convicted based on scientific evidence unless the person who, himself has done the testing can be examined: that is, the simple use of a report is insufficient to sustain a conviction. I believe this principle applies to my situation.

6. There is no halfway house medical staff to prescribe medication, and in the emergency I had of a very bad upset stomach, it was not unreasonable for

Robert McFadden
Page Three
August 4, 2010

me to take one prescription pill for that. I did not knowingly or intentionally violate any rule. Moreover, the subject incident didn't occur at a "facility," as is set forth at #6 of the Incident Report, but occurred when I took the pill at my home, where I was authorized to be working on June 21 and June 22.

        7. In conclusion, I didn't knowingly or intentionally violate any rule or policy at all; I was authorized both by my physician and John Uyeda to take the subject medication and it was not unreasonable for me to have taken it (if, in fact I did, and that is the only possible explanation, if the urine test result is accurate); and I should have gone to home confinement on July 23, as authorized, and should not have been taken into custody, found culpable, have 40 good time days taken away, and have to remain in prison from now until Dec. 11, 2010, based on what occurred, because that is unreasonable.

        Please promptly review this matter and send me to home confinement or back to a halfway house and expunge this matter from my record. I never, ever have taken any non-prescription medication, in my entire life -- I'm nearly 66 years old -- nor have I ever taken any illegal drug, nor do I drink alcohol. This entire matter seems to me to be absurd. Thank you.

                            Sincerely,

                            STEPHEN YAGMAN

# DECLARATION OF STEPHEN YAGMAN

I, STEPHEN YAGMAN, declare the following to be true under the penalty of perjury, pursuant to 28 U.S.C. 1746, at Los Angeles, California on July 25, 2010.

1. I am a federal Bureau of Prison's prisoner whose register number is 43263-112. I am 65 and a half years old. ~~My CV is attached hereto, its contents are accurate, and they are incorporated herein by this reference.~~

2. Because I am not in physical circumstances to personally sign this declaration, I shall have e-mailed it to my lawyer, Marion R. Yagman, and I authorize her to affix my signature stamp, that she has, to it, in the event I shall not have gotten it back in time to sign it.

3. On November 27, 2007, I was sentenced to a term of imprisonment of 36 months.

4. I reported to the Butner, North Carolina prison camp on March 31, 2008, on which date my "out date" was calculated to be November 8, 2010, based on a calculation of projected "good time" credit.

5. In 2009, I was given a May 13, 2010 date to report to a half-way house at 9411 South Central Ave., Los Angeles 90001, whose name is Cornell Companies Marvin Gardens, and also was given a date of July 23, 2010 to be eligible for transfer from that half-way house to home confinement.

6. I had no difficulties of any kind at the half-way house.

7. On or about May 18, 2010, I began regularly working at my old law firm, Yagman & Yagman & Reichmann as a paralegal, working both at its office at 723 Ocean Front Walk in Venice and at my home office at 38 28th Avenue in Venice, and I continued that work schedule, Monday through Friday, 7:30 a.m. to 7:30 p.m., until a remarkable event on Friday, July 2.

1

8. At that time, I was taken into custody by two U.S. marshals, and told I had failed a urine test because I had tested positive for a barbiturate, phenobarbital. I never in my life have taken phenobarbital. I never in my life have taken any non-prescription drug.

9. I was brought to the Los Angeles Metropolitan Detention Center ('MDC') and I was puzzled by what had happened.

10. I was not served with any statement of charges, and merely was verbally informed by one marshal of what had occurred.

11. On Wednesday, July 7, my case manager from the half-way house, Kim Fowler, came to the MDC and "served" me with a statement of charges, a copy of which is attached hereto. Fowler told me there would be a hearing on the charge at 4:00 p.m. on that date, July 7, but there was none. I told Fowler, in response to her inquiry whether I wanted to present any evidence or witnesses at the hearing, that I wanted to call as witnesses, half-way house employees Katherine Turner, to show she had never served the charge on me, John Uyeda, chief of security, to testify to matters I set forth hereinbelow, and I wanted my lawyers to be able independently to test the subject urine sample. She did not respond to this.

12. That was the first time I had seen the document, yet on it was an attestation that a low-level worker at the half-way house named Katherine Turner had given it to me on Friday, July 2, between 11:00 a.m. and noon, though the line for my signature to acknowledge having received it was blank. Ms. Fowler asked me to sign it on July 7, to attest that I had received it on July 2, but I declined because of the discrepancy in the date.

13. The BOP rules require that a prisoner be served with written charges of an alleged rule violation within 24 hours of the BOP learning of an alleged rules infraction, not counting the day the BOP learns of the infraction, and thus, having learned of the infraction on June 29, the BOP had until the end of the day on

2

Wednesday, June 30, to serve me with the Incident Report. By not serving me, my due process right was violated. The rules governing service of Incident Reports and hearings are set forth at pages 38-39 of the Admission and Orientation Handbook for the MDC-Los Angeles, are uniform throughout the BOP, and provide the following:

> "Inmate Discipline Information: I f a staff member observes or believes
> he or she has evidence that an inmate has committed a prohibited act,
> the first step in the disciplinary process is writing an incident report.
> This is a written copy of the charges against the inmate. The incident
> report shall ordinarily be delivered to the inmate within (24) hours of
> the time staff becomes aware of the inmate's involvement in the
> incident. . . . .
>
> "Initial Hearing: Inmates must ordinarily be given an initial hearing
> within three working days of the time staff become aware of the inmate's
> involvement in the incident (excluding the day staff become aware of the
> incident, weekends, and holidays). . . . The UDC [Unit Disciplinary
> Committee] must give its decision in writing to the inmate by the close
> of business the next work day. The UDC may extend the time limits of
> these procedures for good cause. The Warden must approve any
> extension over 5 days. The inmate must be provided with written
> reasons for any extension. The UDC will either make final disposition
> of the incident, or refer it to the DHO [Disciplinary Hearing Officer] for
> final disposition."

None of these time limits or procedures was followed. The infraction was learned of on June 29, and therefore, the Incident Report was to have been served no later than June 30. The hearing was required to have been held by the end of July 2, but it was not held until July 8, more than 5 days after it was required to

3

have been held. No decision in writing, or any decision at all, was rendered or served, much less by the required time. No extension of time was sought, and no approval for any extension was given by a warden or similar official. No written reasons for any extension were given. The UDC held a hearing out of time and apparently made no final decision and did not refer the matter to a DHO. I did not waive any requirement.

Thus, my due process rights were violated at least in the following respects:

A. I was not served with the Incident Report within 24 hours, but was served over five days later;

B. The initial hearing was not held within three work days, but instead was held within six work days;

C. No extensions of time were sought or granted, much less was any good cause for any extension sought;

D. I was not permitted to call Katherine Turner as a witness to corroborate my statement that I was not served with the incident report on July 2, as she falsely stated on that Report;

E. I was not permitted to call John Uyeda as a witness to corroborate my statement that he authorized me to take prescription medications whose names were set forth on the list I presented to him on May 13; and,

F. I was not permitted to test the urine sample that allegedly tested positive for phenobarbital.

14. On Thursday, July 8, another case manager from the half-way house, Kevin Kincey, came to MDC and held a "hearing." I reiterated that I wanted the witnesses whose names are set forth above and an opportunity to test the urine sample, and his response was that I could not call the witnesses or have an independent test done on the urine.

4

15.  He held the "hearing," at which I told him the following: I had no idea why the urine sample tested positive for phenobarbital, but, if it tested for phenobarbital, then the only explanation of which I then could think would be that I could have taken a prescription Donnatal (also called Bellatal) pill for an upset stomach, for which I had a prescription (a copy of which is attached hereto), but that I did not remember having taken such a pill; that when I checked into the Butner prison camp, I had provided the intake person with both a list of all medications for which I had prescriptions (a copy of which is attached hereto) as well as all the medications, the list was made part of by BOP file, and the medications were confiscated; that when John Uyeda checked me into the half-way house on the evening of May 13, 2010, I had given him the same list of my medications, and was told by him I could take all medications for which I had prescriptions, and that once he had seen the list he did not need to retain a copy; Uyeda gave me no listing of half-way house rules.

16. The July 8 "hearing" was required by BOP rules to have been held within 3 work days of when the BOP learned of the alleged infraction, but it was not, thus violating by due process right.

17. I heard nothing again of the "hearing," or of its disposition.

18. On Monday, July 12, I was told I would be transferred from MDC, but was not told to where.

19. On Thursday, July 15, I was awakened at 5:00 a.m. and taken by bus to Victorville Airport and told I was being flown to Oklahoma City and then to Butner, North Carolina. No one would answer any of my questions about what was going on or why. I became very anxious.

20. At about noon on July 15, I was told I was being taken to the San Bernardino County jail, at which I arrived at 1:00 p.m.  From 5:00 a.m. until 1:00 p.m., I was shackled hand and foot.

5

21. I was not booked into the San Bernardino County jail until 10:00 p.m. on July 15. I was put in a 8' x 13' cell and in a bunk whose height was approximately three feet from bottom to top, with a solid sheet metal top. It was like a coffin, open only on one side. I became very claustrophobic and anxious.

22. At about 3:00 a.m. on July 16, I awakened, believing I had been buried alive, and then woke up on the floor, with severe chest pain and severe pain down my left upper and lower arm.

23. Someone summoned a jailor, a electrocardiogram was done, and I was ordered sent, chained hand and foot, to Arrowhead Regional Medical Center, in Colton, where I spent all day on Friday, July 16 in the emergency room, and where I was admitted late that day.

24. I remained under guard in a room, and never got out of bed, until Monday, July 19. Numerous tests where done on me, including electrocardiograms, an echo cardiogram, and a stress test. The result of the latter tests was that there was a "low [then-current] probability of CVD." I believe I suffered a minor heart attack, but this neither could be confirmed nor denied. During the period July 14-20, I lost approximately 15 pounds of my usual 215 pound weight. I now look haggard and tired, which I am. I was ordered discharged from the hospital.

25. At 7:00 p.m., I was re-admitted to the San Bernardino County jail and placed back into a protective custody cell, and then awakened at 3:00 a.m., and told I was being transferred back to MDC, to which I was taken at 5:00 a.m.

26. I was supposed to be released from the half-way house to home confinement on Friday, July 23, but that did not occur.

27. I have been given no information about the disciplinary charge against me, that is taking medication that was not prescribed by the half-way house,

6

though the half-way house couldn't prescribe any medication for me.

STEPHEN YAGMAN